Joseph P. GALDA, Paul Ewert and Kristina Farrow, Individually, and upon behalf of all others similarly situated, Plaintiffs,

v.

Dr. Edward J. BLOUSTEIN, Individually, and as President of Rutgers, The State University, Dr. Norman Reitman, Individually, and as Chairman of the Board of Governors of Rutgers, The State University of New Jersey, Donald S. McNaughton, David A. Werblin, Katherine Elkus White, Donald M. Dickerson, Sanford M. Jaffe, Robert Kaplan, Edward Kramer, Linda Stamato, Robert J. Torricelli, Individually, and as members of the Board of Governors of Rutgers, The State University of New Jersey, and Walter K. Gordon, Individually, and as Dean of Rutgers Camden College of Arts and Science, Defendants.

Civ. A. No. 79–2811.

United States District Court, D. New Jersey.

June 19, 1981.

Bradford S. Smith, Cinnaminson, N. J., for plaintiffs; Myrna P. Field, Mid-Atlantic Legal Foundation, Philadelphia, Pa. and Hugh Joseph Beard, Jr., Charlotte, N. C., of counsel.

Frederick L. Whitmer, Pitney, Hardin & Kipp, Morristown, N. J., for defendants Bloustein, Reitman, McNaughton, Werblin, White, Dickerson, Jaffe, Kaplan, Kramer, Stamato, Torricelli, and Gordon Lewis Goldshore, Trenton, N. J., for defendant-intervenor New Jersey Public Interest Research Group, Inc.; John Cary Sims, Washington, D. C., of counsel.

## OPINION

BROTMAN, District Judge.

Traditionally, First Amendment litigation has focused on the affirmative rights of individuals and groups to freedom of speech and association. In recent years, however, the increasing centralization of society has led to free speech concerns of a somewhat different nature—that individuals not be compelled to adhere to or support ideological positions espoused by powerful governmental or commercial organizations. *See, e. g., First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In addition, the increasing complexity of society has inexorably led to significant governmental involvement in matters, such as higher education, that were once the exclusive domain of individuals and private organizations. These governmental incursions into new areas frequently raise troublesome First Amendment issues regarding the proper extent of governmental involvement in speech. *See, e. g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Maryland PIRG v. Elkins,* 565 F.2d 864 (4th Cir. 1977). The instant case implicates precisely these concerns.

In this action, three students at Rutgers-Camden College of Arts and Sciences (hereinafter "RUCCAS"), a branch of Rutgers, The State University of New Jersey (hereinafter "Rutgers"), challenge the university's policy of funding the New Jersey Public Interest Research Group (hereinafter "PIRG"), a politically active organization whose members are students at various colleges throughout the State. PIRG is fund-

ed by a mandatory but refundable fee of $2.50 per semester, which is added to the bill of every student at RUCCAS, and other participating colleges. Plaintiffs contend that this policy violates their First Amendment rights.[1] Their claim for damages and injunctive relief is asserted pursuant to 42 U.S.C. § 1983, and jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343. Plaintiffs sought to bring the action on behalf of a class consisting of all students in good standing at RUCCAS at any time between September 1, 1977 and April 1, 1980 who have not received a refund of the PIRG fee. In its opinion of September 16, 1980, this court denied plaintiffs' motion for class certification. Defendants are officers of Rutgers and members of its Board of Governors. PIRG, not originally named as a party, was permitted to intervene as a defendant pursuant to Rule 24 of the Federal Rules of Civil Procedure.

■ Currently being considered by the court are defendants' motions for summary judgment. Fed.R.Civ.P. 56.[2] Plaintiffs have opposed the summary judgment motions and have moved for an order compelling continued discovery. The standard for summary judgment is, of course, a stringent one. Summary judgment may only be granted "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover,

When considering a summary judgment motion, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt."

*Special Jet Services, Inc. v. Federal Ins. Co.*, 643 F.2d 977, 980 (3rd Cir. 1981), *quoting Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3rd Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In brief, summary judgment is not designed to provide an easy method for the resolution of factual issues; rather, it is a mechanism to allow the efficient resolution of cases in which there are no genuine issues of fact. *See Manetas v. International Petroleum Carriers, Inc.*, 541 F.2d 408 (3rd Cir. 1976).

Notwithstanding this stringent standard, the instant action is ripe for summary judgment. Considerable discovery has been conducted, and the relevant facts concerning both PIRG and the Rutgers funding policy are well established. In brief, there is no genuine issue with respect to any material fact. Accordingly, the court must determine the legal issue of whether the funding of PIRG violates plaintiffs' constitutional rights. We conclude that it does not.

## FACTS

The record of this action, drawing all inferences in favor of plaintiffs, discloses the following facts. In March of 1972, in large measure at the prompting of PIRG, the Rutgers Board of Governors adopted a policy for funding student organizations that were not eligible to receive funds from

---

1. The First Amendment is applicable to state action by way of its incorporation in Fourteenth Amendment Due Process. *See Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). For ease of discussion, we shall refer throughout this opinion to the First Amendment with the understanding that it is only applicable through its incorporation into the Fourteenth Amendment. For purposes of the instant summary judgment motions, defendants concede the presence of state action.

2. Also before the court are defendants' motions to dismiss for lack of subject matter jurisdiction and for lack of a justiciable case or controversy. We conclude that subject matter jurisdiction exists; *see Parratt v. Taylor*, —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); and that the matter does present a justiciable case or controversy. *See Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

student activity fees.[3] As amended, the policy provides that such student organizations may be funded by means of mandatory fees which are added to each student's term bill.[4] Though mandatory, the fee is refundable upon the student's request, and a postcard for the student to request a refund is required to be enclosed with the term bill. The organization is required to reimburse the University for any costs incurred in collecting the fees. To be eligible to participate in the funding program, an organization must present a plan to the University Senate every three years for "concept review." If approved by the University Senate and President, the organization must be endorsed by the students in a referendum, which must be held at each participating college every three years. To be funded, the organization must receive the approval of a majority of those voting; the affirmative vote is required to exceed 25 percent of the eligible student body.

As it currently operates at RUCCAS, the funding system is relatively straightforward. A fee of $2.50 is added to each student's term bill and identified as the PIRG fee.[5] The fee is described as mandatory, though in fact the University does not impose any sanctions upon students who refuse to pay it. A leaflet that describes PIRG and its activities is enclosed with the term bill. The back of the leaflet contains a form which those students desiring a refund must complete and submit to PIRG.[6] The form does not ask for any explanation or statement of reasons for the refund request. It takes a considerable period of time, generally several months, before the refunds are actually made. Each semester, Rutgers bills PIRG for the costs of administering the fee collection program, which generally amounts to approximately $300.00. PIRG currently receives approximately $15,000.00 per year from RUCCAS students through the funding policy. Student fees constitute a significant amount of PIRG's total funding. Much of the remaining funds come in the form of grants from

---

3. PIRG is ineligible for student activity funds because it is an independent corporation not under the control of the university.

4. The funding policy provides as follows:

   The following is a statement of University policy regarding the funding of student sponsored programs and organizations which are not legally eligible to receive funds from student activity fee accounts:

   (1) Each organization is required to present its program and plans for concept review to the University Senate for recommendation to the President.
   (2) If approved, the organization shall seek college referenda on the issue of student funding support for their program. At least fifty per cent of the student body of each division of the University shall be required to participate in such referenda and a majority of those voting must approve the project in order for implementation within that division. As an alternate, an affirmative vote of twenty-five per cent of the student body plus one shall be adequate to meet this test.
   (3) The organization shall then be listed on the University term bill with payment of the indicated fee mandatory. A postcard asking for a refund shall be included along with the term bill which shall be sent by the individual student to the organization and which shall send the refund directly to the student.

   (4) Each organization so funded shall be expected to defray the University cost of administration of the fee collection.
   (5) Each organization shall be required every three years to meet the tests defined under items # 1 and # 2 above in order to continue to receive funds under this policy and procedure.

5. PIRG is the only organization at RUCCAS that takes advantage of the funding policy. At the New Brunswick campus of Rutgers, the funding system is used by the school newspaper, The Targum, as well as by PIRG.

6. In this respect, the operation of the funding system does not conform precisely to the University policy statement, which mandates that a postcard for requesting a refund be enclosed with each term bill. We perceive nothing constitutionally invidious about this variance between policy and practice.

   More serious concerns are raised by the fact that PIRG has, on occasion, not garnered sufficient votes to satisfy the requirements of the funding policy, but has nonetheless been allowed to continue receiving funds, as long as less than three years has elapsed since the last election in which PIRG satisfied the requirements of the funding policy. However, although this aspect of the University's implementation of its funding policy can surely be criticized, it does not amount to a violation of plaintiffs' constitutional rights.

various government agencies, usually allocated for particular research projects.

New Jersey PIRG is a statewide student organization with approximately 21,000 members at eight colleges. It is a non-profit organization engaged in research, writing, publicity, lobbying, and litigation with respect to numerous controversial public issues, including nuclear power, energy conservation, abortion rights, and environmental protection. Plaintiffs oppose the positions PIRG has taken on many of these issues. Although PIRG does not support or oppose candidates for public office, it vigorously asserts positions with respect to pending legislation. It is incorporated under the laws of New Jersey and is completely independent of any control by Rutgers or University officers. PIRG's policies are determined by its Board of Directors, which is composed of student representatives from the participating colleges. The implementation of these policies is largely entrusted to PIRG's professional staff and the students who work under its direction.

PIRG has two basic goals. One is to effect social and political change in the areas of its concern. PIRG's second goal is to involve university students in public affairs so as to broaden their educational experiences and help develop a more sophisticated and active electorate. PIRG accomplishes these goals by giving students the opportunity to participate on every level of its activities, from conducting basic research to formulating organizational policy. A significant number of students at RUC-CAS actively participate in PIRG internship programs, some of whom receive academic credit for their work.

## DISCUSSION

Plaintiffs challenge the funding of PIRG on First Amendment grounds. It is immediately apparent, however, that plaintiffs do not have a classical First Amendment claim: the funding system works no abridgement or suppression of plaintiffs' affirmative rights to freedom of speech or association. Rather, plaintiffs contend the funding system violates their constitutional rights in three somewhat distinct respects. First, relying primarily on *Abood v. Detroit Board of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), they argue that the funding policy unconstitutionally compels their support of ideas with which they disagree. Secondly, relying on *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), they contend that the refund procedure impermissibly intrudes on their freedom of association and freedom to refrain from disclosing their views. Thirdly, plaintiffs argue that the funding policy is a form of governmental support of a political orthodoxy, which, they contend, is prohibited by the First Amendment. We shall consider these arguments seriatim.

Plaintiffs' initial argument is that the state may not compel their support of social and political ideas with which they disagree. They contend that the Rutgers funding policy conditions their right to attend a public university on their financial support of ideologies they oppose and that the policy is therefore unconstitutional. In this regard, plaintiffs rely principally on *Abood, supra*, and *Wooley, supra*. *See also Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If, indeed, plaintiffs' right to attend a public university were conditioned on their support of ideological positions they found obnoxious, we would have no hesitancy to find a First Amendment violation. That, however, is simply not the case.

■ The pivotal precedent in this regard is *Abood, supra*.[7] In *Abood*, the Court held

---

7. A number of courts have held that a public university's use of mandatory student fees to support politically active student organizations does not violate the constitutional rights of those students who hold opposing views. *See Arrington v. Taylor*, 380 F.Supp. 1348 (M.D.N.C.1974), *aff'd mem.*, 526 F.2d 587 (4th Cir. 1975); *Veed v. Schwartzkopf*, 353 F.Supp. 149 (D.Neb.), *aff'd mem.*, 478 F.2d 1407 (8th Cir. 1973), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974); *Larson v. Board of Regents*, 189 Neb. 688, 204 N.W.2d 568 (1973);

that public employment could not be conditioned on the compelled payment of agency shop fees, which were used in part to support ideological and political causes unrelated to the union's role as a collective bargaining representative. *Id.* 431 U.S. at 234–35, 97 S.Ct. at 1799. *See also Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); *Machinists v. Street,* 367 U.S. 740 (1961). *Abood,* therefore, directly supports the proposition that compelled political contributions may infringe one's constitutional right to refrain from speech. 431 U.S. at 234, 97 S.Ct. at 1799. *See Wooley, supra,* 430 U.S. at 714, 97 S.Ct. at 1435. Nonetheless, there are two basic distinctions between the facts present in *Abood* and the instant situation, which render the holding of *Abood* inapposite here.

First, although the *Abood* Court invalidated that portion of the agency shop fee which was used to finance political contributions, it expressly upheld the constitutionality of fees imposed to finance the union in its role as a collective bargaining agent. 431 U.S. at 222, 97 S.Ct. at 1792. *See also Street, supra; Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). The Court upheld mandatory support of the union notwithstanding the fact that some of the plaintiffs were ideologically opposed to collective bargaining in the public sector. 431 U.S. at 212–13, 97 S.Ct. at 1787–88. By analogy, therefore, the university can require the payment of fees for matters germane to its role as an educational institution, whether or not the plaintiffs support the university's position in that respect. *Cf. First Nat'l*

*Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, for example, plaintiffs could not invoke the First Amendment as a justification for withholding the portion of their tuition used to finance an Afro-American Studies Department, however vehemently plaintiffs might oppose the existence of such a department and the views being expressed by its faculty.[8]

Obviously, PIRG's activities are less intimately related to the educational process than are the research and teaching functions of an individual scholar or a university department. In addition, PIRG is neither a purely student organization nor one oriented primarily towards the campus. It is clear, however, that PIRG is, in large measure, a student organization and that it performs legitimate educational functions. *See Maryland PIRG, supra,* 565 F.2d at 865; *Arrington v. Taylor,* 380 F.Supp. 1348, 1363 (M.D.N.C.1974), *aff'd mem.,* 526 F.2d 587 (4th Cir. 1975). In this regard, it is important to bear in mind not only the active involvement of students in establishing and implementing PIRG policy, but also the contemporary understanding that education, particularly on the university level, embraces far more than the three R's. Moreover, in determining whether PIRG is sufficiently educational to survive the scrutiny mandated by *Abood,* it is worth noting that the University Senate must approve a "concept plan" for every organization seeking to take advantage of the funding policy. The judgment of these professional educators regarding the value of PIRG demands considerable deference. *Cf. Healy v.*

---

*Good v. Associated Students,* 86 Wash.2d 94, 105, 542 P.2d 762 (1975). *See generally* Gibbs & Crisp, *The Question of First Amendment Rights vs. Mandatory Student Activity Fees,* 8 J. L. & Educ. 185 (1979). *Cf. Maryland PIRG v. Elkins,* 565 F.2d 864 (4th Cir. 1977); *Joyner v. Whiting,* 477 F.2d 456 (4th Cir. 1973). These cases, however, antedate the Supreme Court's decisions in *Abood* and *Wooley,* on which plaintiffs place considerable reliance. Thus, we hesitate to rely too heavily on them. Nonetheless, to the extent that the pre-*Abood* cases approved the use of mandatory and non-refundable student fees for the support of politically active organizations, they would seem to

indicate that the refundable fee at issue here is well within permissible constitutional bounds.

**8.** A similar rationale would probably support the use of mandatory fees to finance student newspapers and purely student organizations, both of which are an integral part of the educational experience offered by contemporary universities. *See Arrington v. Taylor,* 380 F.Supp. 1348 (M.D.N.C.1974), *aff'd mem.,* 526 F.2d 587 (4th Cir. 1975); *Veed v. Schwartzkopf,* 353 F.Supp. 149 (D.Neb.), *aff'd mem.,* 478 F.2d 1407 (8th Cir. 1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974).

*James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Nonetheless, at least for purposes of the instant motion, we must conclude that not all of PIRG's activities are truly educational or adequately linked to the University to survive the *Abood* standard. However, we need not undertake the difficult task of demarcating PIRG's legitimately educational functions from its purely ideological activities; for the second basic distinction between the instant scheme and that considered in *Abood* removes any doubt regarding the former's validity.

■ Unlike the funding system invalidated in *Abood*, the policy adopted by Rutgers mandates that each student must receive a complete refund of the fee upon his request. Thus, in actuality, Rutgers students are not compelled to support ideological positions that they oppose; to the extent that they do not want to support PIRG, Rutgers students are able to demand a refund of the fee they paid. In *Abood* the Court implied that a legitimate refund system, such as that in operation at Rutgers, would be adequate to redeem any constitutional infirmities that might otherwise exist. 431 U.S. at 238–40, 97 S.Ct. at 1801–02.[9] This position was later confirmed in *Bellotti*, 435 U.S. at 794 n. 34, 98 S.Ct. at 1425 n. 34. *See also Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Admittedly, the funding system adopted by Rutgers does entail a temporary deprivation of funds and puts a burden on the dissenting student to request a refund.

Perhaps it would be preferable if the fee were voluntary rather than mandatory in nature. We conclude, however, that the presence of the refund procedure preserves the constitutionality of the funding policy. For the undisputed fact is that plaintiffs have, at their disposal, an easy mechanism whereby they may withdraw all support from PIRG. Thus, plaintiffs' claim that they are compelled to support ideologies that they oppose is without merit.

■ Plaintiffs' second argument is that the refund procedure itself violates their constitutional rights of free speech and association. They rely, in this regard, on *Wooley, supra,* and *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), as well as on a series of cases in which the Supreme Court established an individual's right to refuse to disclose his organizational affiliations. *See, e. g., Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Plaintiffs note that to exercise their right to refrain from supporting PIRG they must apply for a refund of the PIRG fee. In doing so, they must disclose their identities, a procedure which, they contend, violates their First Amendment rights.[10]

We find no merit in plaintiffs' argument. Initially, it is important to recognize that plaintiffs are in no way restricted in their freedom of association. The right they assert is, at most, that to disassociate them-

---

9. *See Carlson v. Portland*, 45 Or.App. 439, 608 P.2d 1198 (1980); *Warner v. Board of Educ.*, 99 Misc.2d 251, 415 N.Y.S.2d 939 (1979); *Association of Capitol Powerhouse Eng'rs v. Division of Bldg. & Grounds*, 89 Wash.2d 177, 570 P.2d 1042 (1977). In addition, several pre-*Abood* cases upheld agency shop funding schemes that allowed for refunds of that portion of the fee earmarked for ideological or political contributions. *See, e. g., Seay v. McDonnell Douglas Corp.*, 533 F.2d 1126 (9th Cir. 1976); *Reid v. International Union, United A., A. & A. Imp. Wkrs.*, 479 F.2d 517 (10th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 572, 38 L.Ed.2d 483 (1973).

10. To the extent that plaintiffs argue that, because of their status as Rutgers students, the very existence of the funding policy identifies them with PIRG's ideological positions their argument is frivolous. PIRG cannot and does not purport to act on behalf of Rutgers or on behalf of all of the students at the university. PIRG policies are not adopted by the university or the student body as a whole, and are not identified with the school or student body as a whole. Moreover, plaintiffs remain free to disassociate themselves from PIRG in any reasonable manner they deem appropriate. *See Pruneyard, supra*, 100 S.Ct. at 2044; *Arrington, supra*, 380 F.Supp. at 1362.

selves from the majority.[11] Thus, the instant situation is vastly different from that present in the cases plaintiffs rely upon, where individuals were discouraged from exercising their right to affirmatively associate themselves with various politically active groups. *See, e. g., NAACP v. Alabama, supra,* 357 U.S. at 462, 78 S.Ct. at 1171. Moreover, in the cases that plaintiffs rely upon, there were very real dangers of reprisal and discrimination faced by those who chose to exercise their protected rights of association. By contrast, in the instant action, the record is utterly devoid of any attempts to interfere with the refund procedure or to discourage students from taking advantage of that procedure. *Cf. Lamont, supra,* 381 U.S. at 301, 85 S.Ct. at 1493. The requirement that those Rutgers students who want a refund of the PIRG fee must make application for it is at most a nuisance. No explanation is required or even asked for; indeed, the request may mean no more than that the individual is indigent or, perhaps, tightfisted. In short, the refund procedure requires neither a political expression nor an associational identification, and no reprisals follow its exercise. The refund scheme, therefore, does not infringe plaintiffs' First Amendment rights.

Our conclusion in this respect is consistent with the Supreme Court's decision in *Abood.* The Court indicated that the union could not require dissenters to identify specific positions with which they disagreed, but it upheld the validity of a general refund procedure, comparable to the one in operation at Rutgers. 431 U.S. at 240–42, 97 S.Ct. at 1802–03. *See also Railway*

*Clerks v. Allen,* 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963). Such a system provides maximum protection to individual rights and liberties, while preserving the ability of the majority to organize effectively.

▮ Plaintiffs' third challenge to the funding policy is that it is a form of impermissible governmental support of a political orthodoxy. For two reasons, this argument is unpersuasive. First, there is no basis for the conclusion that the funding system is an attempt to impose an orthodox ideology. It is merely a neutral mechanism whereby student organizations may obtain financial support from the student body. *See Pruneyard, supra,* 100 S.Ct. at 2044; *Buckley, supra,* 424 U.S. at 86–91, 96 S.Ct. at 666–69. It is true, as plaintiffs observe, that those who wish to take advantage of the funding system must submit a "concept plan" to the University Senate and administration. However, there is no evidence to indicate that this is a mechanism to promote any particular views. *See Veed, supra,* 353 F.Supp. at 152. Rather, all of the pertinent evidence reveals that this is the means by which university officials ensure that an organization seeking funds will serve the interests of the students and be of educational value. Review of this nature by those entrusted with the responsibility for educating the student body is both proper and desirable.[12]

▮ Secondly, and more fundamentally, plaintiffs' argument is based on the erroneous assumption that government may not take a position on ideological issues. *See*

11. Assuming that the right posited by plaintiffs does in fact exist, it is difficult to imagine how it can be effectuated without requiring the dissenter to disclose his identity. Thus, in *Wooley, supra,* the Court held that plaintiffs could obscure the state motto on their license plate, but refused to require the state to provide "motto-less" plates. *See* 430 U.S. at 709 n. 7, 97 S.Ct. at 1432 n. 7. Obviously, by forcing Wooley to obscure the motto, the Court compelled him to disclose his identity, indeed, to disclose his opposition to the motto. *Cf. Thomas v. Review Bd. of Ind. Empl. Sec. Div.,* —— U.S. ——, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Far less is required of the plaintiffs in

the instant case. They need make no public statement, but merely must submit a refund request form to PIRG. As noted earlier, the refund form does not require any identification of the requestor's ideological positions or an explanation for the request. It merely asks for one's name, address, college, and student number. Thus, the student is allowed to "maintain his own beliefs without public disclosure." *Abood, supra,* 431 U.S. at 241, 97 S.Ct. at 1802.

12. The record reveals that no student group seeking funding has had its concept plan rejected by the University Senate.

generally L. Tribe, American Constitutional Law § 12–4 (1978); Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship*, 21 B.C.L.Rev. 578 (1980). Contrary to plaintiffs' apparent assumption, there is no counterpart to the establishment clause in the realm of political speech. Although Government may not compel adherence to its views, it may participate in the marketplace of ideas.[13] *See Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1110 (D.C.Cir.1978) (en banc); *Joyner v. Whiting*, 477 F.2d 456, 461 (4th Cir. 1973). This distinction is well illustrated by the Court's decision in *Wooley, supra*. The Court indicated that the state had a legitimate interest in communicating its point of view and it affirmed the lower court order, which specifically did not require the state to issue license plates without the disputed motto. *See* 430 U.S. at 709, n. 7, 717, 97 S.Ct. at 1432, n. 7, 1436. The Court merely held that individuals had a right not to serve as unwilling couriers for the state's message. Thus, while Rutgers may not compel its students to adhere to an orthodox university ideology, the school, although a state institution, may take a position on social and political matters. In short, even if plaintiffs were able to produce evidence that Rutgers was using the funding policy to espouse certain ideological positions, that would not constitute a violation of their First Amendment rights.

## CONCLUSION

In our society for speech and political action to be effective they must generally be done on a concerted basis. This requires both organization and funds. Thus, for students to be able to participate fully in society and effectively exercise their First Amendment rights, they must be given the opportunity to organize and raise funds. The fact that students are enrolled at a state university is no reason to deny them that opportunity; indeed, the involvement of the state implicates First Amendment protections for speech and related activities. That is not to. say that a state university is required to support the ideological causes espoused by its students, but the presence of state action does not bar university officials from supporting students' political and ideological endeavors. *Cf. Pruneyard, supra*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741. In rendering such support, though, officers of the state must be vigilant to avoid contravening the First Amendment interests of those students who disagree with the positions being advocated by their fellows.

The Rutgers funding policy at issue here helps effectuate the First Amendment rights of the majority without burdening the rights of dissenters. The policy is not merely constitutionally acceptable but, in fact, advances the two fundamental values underlying the First Amendment: it facilitates individual students' interests in association and expression and it serves society's interest in open and informed discussion of public issues. *See Bellotti, supra*, 435 U.S. at 777 n. 12, 98 S.Ct. at 1416 n. 12. *See also Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971). Moreover, the policy accomplishes these goals in a manner that neither restricts the free speech rights of dissenters nor compels their support of causes to which they are opposed. Because the funding policy does not abridge plaintiffs' First Amendment rights, the defendants' motions for summary judgment will be granted.

---

**13.** For this reason, plaintiffs' argument that Rutgers should not provide free office space and other facilities to PIRG is largely irrelevant. First, there is no evidence that this is part of a policy of Rutgers to propagate certain ideas. Second, even if the university did have such a policy, it would not constitute a violation of plaintiffs' constitutional rights unless they were, in some direct manner, compelled to support that policy.