Richard VEED, Plaintiff,

v.

Edward SCHWARTZKOPF et al.,
Defendants.

No. CV72–L–214.

United States District Court,
D. Nebraska.

Jan. 12, 1973.

Lawrence Murphy, Lincoln, Neb., for plaintiff.

Alan E. Peterson, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

The complaint challenges the constitutionality of the imposition of manda-

tory student fees at a state university for use in subsidizing a student newspaper, a student association, and a speaking program. Following denial of a request for a temporary injunction, the case was tried on the merits and now is in position for decision.

## I.

The relevant facts are not seriously in dispute and have largely been set forth in a pretrial stipulation of facts, although by testimony there was supplementation of the stipulated facts. The plaintiff, Richard Veed, is a 20-year-old citizen of Nebraska who presently is enrolled and continuously since the fall of 1970 has been enrolled for the fall and spring semesters as a full-time student at the University of Nebraska at Lincoln. The defendants are members of the Board of Regents of the University of Nebraska, the president of the University of Nebraska, and the chancellor of the University of Nebraska at Lincoln.

At the time of registration during each of the semesters in which the plaintiff has been in attendance at the University of Nebraska he has been required to pay, as a prerequisite to enrollment, mandatory student fees in the total amount of $51.50 each semester in accordance with a fee schedule adopted by the Board of Regents. Of the $51.50 paid each semester, distribution has been made by directive of the Board of Regents to various organizations and functions of the university, including the support of certain noncredit activities, such as the writing and publishing of the daily student newspaper, the *Daily Nebraskan*; the support of the activities and operations of the Association of Students of the University of Nebraska (ASUN); and payment of fees and expenses of speakers appearing at the university through the auspices of the Nebraska Union. The defendants who are members of the Board of Regents evidently intend to continue in the immediate future such use of student fees.

During the tenure of the plaintiff as a student at the University of Nebraska, he has paid mandatory student fees in the following categories complained of in this litigation:

| | |
|---|---:|
| *The Daily Nebraskan* newspaper | $ 6.25 |
| Association of Students of the University of Nebraska | 1.50 |
| Nebraska Union, facilities and speakers | 30.00 |
| Unallocated student fees | 9.75 |
| | $47.50 |

The *Daily Nebraskan* is a newspaper substantially supported by student fee payments collected at the beginning of each semester, although some of its operating revenue comes from the sale of advertising space. The newspaper is one of general circulation on the university campus and is distributed free of charge to all students. Reported are news of general campus interest, sports news, and editorial opinion directed at events of local, national and international significance. The *Daily Nebraskan* is written and published by students under the general supervision of the Publications Board of the University of Nebraska, which is composed of students and faculty members but has no general editorial veto power over the content of the newspaper.

The Association of Students of the University of Nebraska is the student government of the university. It is structured with executive, judicial and legislative branches. The executive is composed of the ASUN president, the first vice president and the second vice president, elected by popular student vote; the student cabinet; the director of records; and the electoral commissioner. The legislative branch is the student senate, composed of 35 representatives elected by students of the various colleges of the university. The judicial branch is the student court consisting of a chief justice and six associate justices, appointed by the retiring president of ASUN at the end of each academic year. A part of the purpose of ASUN is to represent the student view-

point, as expressed through its elected representatives to the various governing bodies of the university itself.

Throughout the academic year, speakers are invited to appear at the university to speak on a wide range of topics. Funds to pay the fees and expenses of these speakers are provided from the mandatory student fees. Initial speaker selection is made by the Talks and Topics Committee of the Program Council of the Nebraska Union Board. Anyone desiring a particular speaker to appear first consults the chairman of the Talks and Topics Committee. Its recommendation then goes to the Program Council, which then submits its recommendation to the Nebraska Union Board, which has the responsibility of final selection. The Nebraska Union Board is composed of seven students, selected by students, and three faculty members, appointed by the chancellor. The Program Council is composed of nine students; the Talks and Topics Committee is composed of a chairman, who is selected by the Program Council, and other members, who are appointed by the chairman of the committee. Special committees have been appointed to handle specialized topics, such as the World in Revolution Conference of 1971.

The unallocated fee fund is for further extracurricular student activities, whether or not as a matter of individual conscience, expression of political belief, exercise of personal religion, or expression of personal liberty the students desire to subscribe to, associate with, or financially support any of such activities.

No credit hours are granted by the University of Nebraska to any student simply because the student writes articles or editorials for the *Daily Nebraskan*, or simply because the student participates in the activities of ASUN, or simply because the student attends the conferences and speaking engagements sponsored by ASUN or the Nebraska Union, or any other activity funded by mandatory student fees. Many voluntary organizations of students at the university are not funded with mandatory student fees, including the UNL Young Republican organization, the UNL Young Democratic organization, and the UNL Student Bar Association.

The defendants have permitted ASUN to use mandatory student fees for paying private attorney fees for ASUN, for paying travel expenses of certain students to conferences of the National Student Association, and for paying salaries of employees of ASUN.

Mandatory student fees were used to pay the expenses of the 1971 Time-Out Conference on Human Sexuality via the use of fees previously allocated to ASUN and the Nebraska Union, which consisted in part of speakers who held themselves out to the public as homosexual persons and who spoke on the state of homosexuality. In 1971 mandatory student fees were used to purchase a birth control book. On November 2, 1972, five days prior to the November 7, 1972, election involving the candidacy of Carl T. Curtis for the office of United States Senator, columnist Jack Anderson spoke on the Lincoln campus of the University of Nebraska as a part of a public speaking program of the Nebraska Union, funded with mandatory student fees.

The plaintiff sharply disagrees with the philosophies expressed by many of the speakers who have been invited to speak at the university and is in substantial disagreement with the editorial philosophies generally adopted by the *Daily Nebraskan*. His concern, however, is not that the *Daily Nebraskan* is published or that the speakers appear, but that fees imposed upon him are used for those purposes without, he claims, a choice on his part. In fact, he quite regularly has read the *Daily Nebraskan* and has attended some of the conferences and speaking appearances, all voluntarily and without compulsion. Neither the university as an entity nor any of the defendants exercises any significant control over the selection process of speakers. Neither the university as an entity nor any of the defendants seeks to make selections of editors of the *Daily*

*Nebraskan* or of speakers on the basis of political or personal philosophy. There is nothing to show that the university, as collector and assessor of mandatory student fees, or any of the defendants has used those fees in an attempt to support or advance any particular political or personal philosophy.

## II.

Although the parties in the final pretrial order have listed a number of issues which they separately contend to be controverted issues of fact and law, I am persuaded that the essential issue may be simply stated as follows: Is a state university constitutionally prohibited from providing a forum for the expression of political and personal opinions with financial support of mandatorily assessed student fees? In my judgment the answer must be in the negative.

The plaintiff argues that requiring him to expend monies for the support of a student newspaper and to pay fees of speakers who appear on the university campus to express political or religious philosophies repugnant to his own is to force him to become associated with such philosophies in violation of his right to freedom of speech, freedom of religion, freedom of the press, and freedom of association.

The difficulty with the plaintiff's position is that it assumes a fact which finds no support in the evidence: that in its program of supporting extracurricular speakers and a student newspaper the university assumes the role of advocate for the particular philosophy expressed by the speakers and the newspaper. The evidence is to the contrary. There is no direction as to how the fees must be spent nor is there any form of editorial censorship exercised over the newspaper. Indeed, such control by the university would raise grave constitutional questions. See Brooks v. Auburn University, 412 F.2d 1171 (C.A. 5th Cir. 1969); Trujillo v. Love, 322 F.Supp. 1266 (U.S.D.C.Colo.1971).

Within wide limitations a state is free to adopt such educational philosophy as it chooses. The Board of Regents of the University of Nebraska obviously has embraced an educational philosophy that the education of students extends beyond that which takes place in the classroom under the tutelage of instructors and professors. The practices of the Board of Regents indicate that it considers as relevant to the educational process extracurricular opportunities for students to be exposed to speakers outside the classroom who may express widely divergent opinions on a number of topics. It clearly has concluded to adopt as a part of the educational process the publication and distribution of a student newspaper. Whether such activities in fact are educational in nature is for the Board of Regents to determine, subject only to the limitations that the determination be not arbitrary or capricious and that it not have the effect of imposing upon the student the acceptance or practice of religious, political or personal views repugnant to him or chilling his exercise of his constitutional rights. As a matter of law and of fact, there has been none of those limitations violated by the university or its officials in this case.

The plaintiff has remained free to associate himself with those political, religious and personal philosophies which most closely conform to his own. No prior restraint has been imposed upon him in the exercise of his constitutional rights, nor have any sanctions been visited upon him because he has chosen to exercise his rights. The First Amendment guarantees that students shall be free to express themselves, as long as the expression does not interfere with the orderly conduct of the process of education. Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Similarly, the First Amendment protects the student from official compulsion to adopt or verbalize any particular political or personal philosophy. Board of Educa-

tion v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). But a university is not constitutionally prohibited from financing through mandatory student fees programs which provide a forum for expression of opinion, be that expression oral or written.

■ Our states, through their colleges and universities, must retain the freedom and flexibility to put before their students a broad range of ideas in a variety of contexts. The wisdom or political desirability of the specific route chosen is not a question to be determined by the courts. Arguments on that point must be directed to a more appropriate forum.

This memorandum of decision shall constitute findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Judgment will be entered for the defendants.