Joseph P. GALDA, Paul Ewert, and Christina Farrow, Individually, and upon behalf of all others similarly situated

v.

Dr. Edward J. BLOUSTEIN, Individually, and as President of Rutgers, The State University, Dr. Norman Reitman, Individually, and as Chairman of the Board of Governors of Rutgers, The State University of New Jersey, Donald S. McNaughton, David A. Werblin, Katherine Elkus White, Donald M. Dickerson, Sanford M. Jaffe, Robert Kaplan, Edward Kramer, Linda Stamato, Robert J. Torricelli, Individually, and as members of the Board of Governors of Rutgers, The State University of New Jersey, Dr. T. Edward Hollander, Individually, and as Chancellor of Higher Education of the State of New Jersey, and Walter K. Gordon, Individually, and as Dean of Rutgers Camden College of Arts and Science.

The New Jersey Public Interest Research Group, Inc., Intervenor.

Appeal of Joseph P. GALDA, Paul Ewert, and Christina Farrow.

No. 81–2433.

United States Court of Appeals, Third Circuit.

Argued March 29, 1982.
Decided Aug. 4, 1982.

Myrna P. Field (argued), Joseph W. Marshall, III, John G. Collins, Mid-Atlantic Legal Foundation, Philadelphia, Pa., for appellants; Bradford S. Smith, Cinnaminson, N. J., of counsel.

Matthew P. Boylan, Gregory B. Reilly (argued), Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for appellees.

John Cary Sims (argued), Alan B. Morrison, Washington, D. C., for intervenor.

Before ADAMS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Plaintiffs in this action are three former students at Rutgers Camden College of Arts and Science (RUCCAS), a unit of Rutgers, the State University of New Jersey.[1] In September 1979, the plaintiffs filed suit under 42 U.S.C. § 1983, alleging that university officers and administrators had violated the students' first and fourteenth amendment rights by extracting from each student a refundable fee to support the New Jersey Public Interest Research Group (PIRG), an independent political/educational organization.[2] The district court held the PIRG funding arrangement constitutional as a matter of law because it contained a refund mechanism, and accordingly granted

1. The record indicates that all of the plaintiffs were graduated from Rutgers by May 1982.

2. Defendants concede the presence of state action. See 516 F.Supp. at 1144 n.1.

the defendants' motion for summary judgment. *Galda v. Bloŭstein*, 516 F.Supp. 1142 (D.N.J.1981). We reverse and remand.

## I

New Jersey PIRG is a non-profit, non-partisan corporation engaged in research, lobbying, and advocacy for social change.[3] Composed of approximately 21,000 student members at eight New Jersey colleges, including RUCCAS,[4] PIRG is controlled by a state-wide board of student representatives, which determines PIRG's programs and policies. Although PIRG has an educational function—involving students "in real-life learning experiences [by] exploring the possibilities and difficulties of legal social change"—all the parties to this litigation agree that PIRG also functions as a political, ideological organization.[5]

Because of PIRG's independent status, the organization is not eligible for student activity funds. In March 1972, however, Rutgers adopted a policy for funding student-sponsored programs and organizations, such as PIRG, that otherwise would not qualify for university financial support. The policy provides that:

(1) Each organization is required to present its program and plans for concept review to the University Senate for recommendation to the President.

---

**3.** New Jersey PIRG's Articles of Incorporation state that

The purposes for which this Corporation is organized are:

1. to engage in non-partisan analysis, study and research of such issues as urban revitalization, consumer protection, resource planning, urban and rural occupational safety and labor conditions, protection of natural areas and environmental quality, racial and sexual discrimination, landlord-tenant relations, delivery of health care and similar matters of urgent or long-range concern to the general welfare of the people of the State of New Jersey.

2. to make available to the public at all times a full and fair exposition of the pertinent facts and results of such non-partisan analysis, study, and research so that citizens may form independent conclusions beneficial to the community.

Appendix at A227.

**4.** In a referendum held in November 1981, PIRG did not receive enough votes to permit continued funding at the RUCCAS campus. *See* text *infra*. PIRG funding remains in effect at a number of other New Jersey colleges, including other Rutgers schools and campuses.

**5.** A brochure published by PIRG describes the following representative accomplishments:

To serve consumers, PIRG...
● testified before the Board of Public Utilities to oppose Jersey Central Power and Light's request to charge consumers for $113 million in costs resulting from the Three Mile Island accident. JCP&L was granted only a $45 million increase.
● published a 100 page *Directory of Consumer and Social Services*, which lists all federal, state and private agencies that handle consumer complaints.
● lobbied extensively for the federal Middle-Income Student Assistance Act, which became law, making millions of additional dollars available to low- and middle-income students to finance their education.

To protect the environment, PIRG...
● has documented water pollution violations by major N.J. industries such as Gulf and Western, Owens-Corning Fiberglass, and Republic Wire.
● lobbied extensively for the law that declared the upper 114 miles of the Delaware River "wild and scenic," thus preventing the building of the ecologically threatening Tocks Island Dam.
● lobbied extensively for the Pinelands Preservation Act of 1979, which became law, establishing an 18-month moratorium on construction in the Pine Barrens.

To work for women's rights, PIRG...
● lobbied for the extension of the dea[d]line for states to ratify the Equal Rights Amendment, and continues to work for the passage of the amendment.

To work for safe, clean energy sources, PIRG...
● published *A New Jerseyan's Consumer Guide to Solar Energy Systems*, a 219 page book about buying, building and financing solar energy systems.
● drafted legislation that mandated a study of the co-generation of electricity for consumers and steam for industry, a process with the potential to save New Jerseyans millions of barrels of oil and millions of dollars every year.
● published a 50 page critical examination of nuclear power, entitled *Everything You Wanted To Know About Nuclear Power, But Were Afraid To Find Out.*
● helped establish New Jersey Solar Action, a coalition of concerned citizens and organizations who promote solar and other renewable energy sources in New Jersey.

Appendix at A776.

(2) If approved, the organization shall seek college referenda on the issue of student funding support for their program. At least fifty per cent of the student body of each division of the University shall be required to participate in such referenda and a majority of those voting must approve the project in order for implementation within that division. As an alternate, an affirmative vote of twenty-five per cent of the student body plus one shall be adequate to meet this test.

(3) The organization shall then be listed on the University term bill with payment of the indicated fee mandatory. A post-card asking for a refund shall be included along with the term bill which shall be sent by the individual student to the organization and which shall send the refund directly to the student.

(4) Each organization so funded shall be expected to defray the University cost of administration of the fee collection.

(5) Each organization shall be required every three years to meet the tests defined under items # 1 and # 2 above in order to continue to receive funds under this policy and procedure.

Appendix at A871–72. PIRG first qualified for funding under the university policy in 1972.

In practice, the PIRG funding system worked as follows: each semester, matriculating students were provided with a bill that included a charge of $2.50,[6] identified as the PIRG fee. The fee was described as mandatory, although apparently there were no sanctions for nonpayment. The bill was accompanied by a flyer describing PIRG; the back of the flyer contained a "Refund Request" form, which could be completed by the student and submitted to PIRG.[7] After receiving a refund request, PIRG verified that the individual was enrolled at Rutgers and had paid the fee. PIRG then issued a check directly to the student, but it

took "several months" before the refunds were actually made.

Plaintiffs, who oppose many of the ideological positions taken by New Jersey PIRG, filed this action on behalf of themselves and as purported representatives of a class of all students in good standing at RUCCAS at any time between September 1, 1977 and April 1, 1980. Essentially, the plaintiffs allege "[t]hat the disbursement of funds derived from mandatory student fees to and for the benefit of [PIRG] has required and shall require the Plaintiffs herein to support financially views which they do not advocate" and that such disbursement violates the plaintiffs' first and fourteenth amendment rights. Appendix at A461 (Amended Complaint). Plaintiffs seek: (1) a declaration that the PIRG funding scheme is unconstitutional; (2) an injunction against further disbursement of the mandatory PIRG fees; (3) an accounting and (4) restitution of sums previously collected.

On September 16, 1980, the district court denied plaintiffs' motion for class certification. Shortly thereafter, the defendants moved for summary judgment. The district court granted this motion, and the plaintiffs have appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

▉ Initially we must address the question whether this case is now moot, inasmuch as the three plaintiffs have been graduated and the PIRG funding scheme was defeated in the most recent RUCCAS student referendum. *See* notes 1 & 4 *supra*. In letter briefs filed with the Court shortly before oral argument, both PIRG and the plaintiffs asserted that the case is not moot. We agree.

In *Finberg v. Sullivan,* 658 F.2d 93 (3d Cir. 1980) (in banc), we held that "[a] case may become moot if (1) the alleged viola-

---

6. Until 1978, the PIRG fee was $1.50.

7. As the district court noted, this procedure varies from that mandated by the Rutgers funding policy, which specifies that a "post-card

asking for a refund" must accompany the term bill. 516 F.Supp. at 1145 n.6. Our analysis of the case does not depend on the particular means by which the student requests a refund.

tion has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have 'completely and irrevocably eradicated the effects of the alleged violation.'" 658 F.2d at 97–98 (footnote omitted) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). Under this standard, it is apparent that the present litigation has retained its vitality as a "case or controversy" for Article III purposes. While the three plaintiffs have been graduated and thus need not fear any future exactions of the PIRG fee, the past exactions of the fee have not been remedied and the relief sought has never been obtained. The fact that the plaintiffs have never sought a refund of their PIRG fees from the university does not compel a contrary conclusion; plaintiffs assert—and we agree—that under the circumstances alleged they constitutionally cannot be required to shoulder even the modest burden of requesting a refund. Aside, then, from plaintiffs' claim for injunctive relief—which, under present circumstances, has been mooted[8]—the cause of action thus remains unaffected by either the suspension of the PIRG fee or the graduation of the plaintiffs.[9]

### III

We turn, then, to the merits of the case before us. Plaintiffs maintain that the PIRG funding system violates their right, established in *Abood v. Detroit Board of Education*, 431 U.S. 209, 235, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977), not "to contribute to the support of an ideological cause [they] may oppose as a condition of [attending the state university]." The mere fact that the PIRG fee is refundable does not, according to plaintiffs, cure the initial con-

stitutional infirmity. Moreover, plaintiffs contend that the refund scheme itself is constitutionally deficient because it forces a dissenter to disclose his or her identity prior to receiving a refund. Finally, plaintiffs take issue with the district court's attempt to balance the free speech rights of the PIRG majority against the minority's right to dissent. Because we agree with plaintiffs' first two arguments—namely, that, at least for summary judgment purposes, the PIRG fee arrangement as described in the complaint offends the principles enunciated in *Abood*, and that the refundability feature of the funding scheme does not suffice to remedy the constitutional defect—we need not reach the other contentions presented by plaintiffs.

### A

Our analysis begins with *Abood*. In that case, the Supreme Court considered the validity of a Michigan statute that permitted unions and local government employers to enter into "agency shop" arrangements under which even those employees who were not union members were required to pay the union a service fee equal to union dues. The Court held that such an assessment was constitutionally permissible only insofar as it was "used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment." 431 U.S. at 225–26, 97 S.Ct. at 1794. Observing that the first amendment is implicated in such circumstances—"An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative," *id.* at 222, 97 S.Ct. at 1793—the Court concluded that any interference with the employees' associ-

---

**8.** We note that, should the district court conclude on remand that plaintiffs' motion for class certification should be granted, *see* note 16, *infra*, the presence of current RUCCAS students within the class arguably may revive the claim for injunctive relief. This could occur if the University reinstates the PIRG fee or if it is determined that the exaction of the fee is "capable of repetition, yet evading review." *See United States Parole Commission v. Geraghty*,

445 U.S. 388, 398–99, 100 S.Ct. 1202, 1209–10, 63 L.Ed.2d 479 (1980).

**9.** *See Abood v. Detroit Board of Education*, 431 U.S. 209, 216–17 n.9, 97 S.Ct. 1782, 1790 n.9, 52 L.Ed.2d 261 (1977) (fact that collective bargaining agreement containing agency shop clause had expired did not render case moot, because some of the plaintiffs had either refused to pay service charge or had paid it under protest).

ational rights was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Id.* at 222, 97 S.Ct. at 1793.

The Justices, however, applied a different analysis to that portion of the union service fee used for political or ideological purposes unrelated to collective bargaining. Reasoning that compulsory political contributions "work[ ] no less an infringement of [the objecting employees'] constitutional rights" than do prohibitions against such contributions, *id.* at 234, 97 S.Ct. at 1799; *see Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and citing Thomas Jefferson's statement that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical," 431 U.S. at 235 n.31, 97 S.Ct. at 1799 n.31, the Court held that to the extent the service fee was used for purely political purposes, it could be extracted only from those employees "who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Id.* at 236, 97 S.Ct. at 1800.

Implicit in Justice Stewart's opinion in *Abood* is the recognition that, when the government impinges on an individual's associational rights—either by prohibiting or compelling association—such action cannot be sustained unless it is justified by a compelling governmental interest. As the plurality stated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.), "[E]ncroachment [upon first amendment rights] 'cannot be justified upon a mere showing of a legitimate state interest.' ... The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." [10] *Id.* at 362, 96 S.Ct. at 2684 (quoting *Kusper v.*

*Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973)). *See also Buckley v. Valeo*, 424 U.S. 1, 44, 96 S.Ct. 612, 647, 46 L.Ed.2d 659 (1976) ("[T]he constitutionality of [the statute] turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression"). In *Abood* itself, the national interest in labor peace, fostered by the collective bargaining process, was deemed sufficiently compelling to justify some intrusion on the employees' rights to associate. Extraneous activity in the political sphere, however, could not be so justified; thus, any political expenditures "not germane to [the union's] duties as collective-bargaining representative" could not be financed from fees paid by those who affirmatively objected to the union's ideological viewpoint. 431 U.S. at 235, 97 S.Ct. at 1799.

In the case at hand, the district court found it unnecessary to examine in any detail the university's proffered justification for its assessment of the mandatory PIRG fee. Rather, the court determined that the refundability feature of the financing arrangement was adequate to cure any constitutional defect that might otherwise exist. Because we conclude that the refund provision is *not* adequate in this regard, *see infra*, we are obliged to examine more closely the constitutional underpinnings of the PIRG funding scheme.

The university insists that, even without the refund mechanism, the mandatory fee at issue here is constitutionally justified because PIRG "makes a legislatively recognized educational contribution to the University and its students." Brief for Appellees at 24. We do not dispute the assertion that PIRG may enhance the education of some Rutgers students. Nonetheless, for purposes of the summary judgment motion here, we must assume that at least one of

---

**10.** Justice Powell, concurring in the judgment in *Abood*, maintained that by requiring the dissenter to step forward and declare his opposition to union activities, the Court had reversed this traditional first amendment principle. 431 U.S. at 263–64, 97 S.Ct. at 1813–14. While

there may be considerable merit to Justice Powell's observation, we do not read the *Abood* majority opinion as requiring any less than an initial showing, by the government, of the compelling reason why it has chosen to exact the compulsory fee in the first place.

PIRG's functions is purely political, and noneducational, in nature. Indeed, plaintiffs allege that "[PIRG] is an organization founded for the primary purpose of advocating specific ideological and political positions before the Congress of the United States, the legislature of New Jersey, and the citizens of the state." Appendix at A991. While the district court stated that "PIRG is, in large measure, a student organization and ... performs legitimate educational functions," 516 F.Supp. at 1147, it concluded, correctly, that "at least for purposes of the [summary judgment] motion, we must conclude that not all of PIRG's activities are truly educational or adequately linked to the University to survive the *Abood* standard." *Id.* at 1148.[11]

■ In holding, as we do, that—at least on the record before us—there is a genuine issue of material fact as to whether the exaction of the PIRG fee infringes upon the constitutional rights of plaintiffs, we do not mean to imply that all mandatory student fees can be invalidated on first amendment grounds. Indeed, a number of courts have held that a university's use of a mandatory (and nonrefundable) student fee to support politically active student organizations does not violate the first amendment. *See e.g., Arrington v. Taylor*, 380 F.Supp. 1348 (M.D. N.C.1974), aff'd mem., 526 F.2d 587 (4th Cir. 1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976); *Veed v. Schwartzkopf*, 353 F.Supp. 149 (D.Neb.), aff'd mem. 478 F.2d 1407 (8th Cir. 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974). Admittedly, these cases antedate *Abood*, and thus their analysis may be challenged. That aside, however, we note that significant differences exist between those situations in which mandatory student fees were upheld, and the case presently before this Court.

In *Arrington*, for instance, the plaintiffs, students at the University of North Carolina, complained that their first amendment

rights had been abridged because they were required to pay a "Student Activities Fee," a portion of which was used to support the university's daily newspaper. Plaintiffs disagreed with many of the editorial positions taken by the paper. The court found that the newspaper provided "a forum whereby differing views on controversial subjects are presented" and that "its most important function is to complement classroom education by exposing the student body to various points of view on significant issues." 380 F.Supp. at 1362–63. The paper "does not speak on behalf of a group with which the plaintiffs are identified.... There is no group, and plaintiffs have available an additional forum to express themselves in opposition to views set forth therein." *Id.* at 1362.

The *Arrington* court relied upon the reasoning employed in a similar case, *Veed v. Schwartzkopf, supra.* There, the court held that the use of mandatory student fees to subsidize the school newspaper, a student government association, and a guest speaker program, did not violate the first amendment. Stressing the judicial deference traditionally accorded university officials charged with the responsibility of devising educational programs, *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), the court concluded that sponsoring programs that provide a forum for the expression of "widely divergent opinions on a number of topics" was well within the discretion of the university Board of Regents. That body "obviously has embraced an educational philosophy that the education of students extends beyond that which takes place in the classroom under the tutelage of instructors and professors." 353 F.Supp. at 152.

In contrast with the programs upheld in *Veed* and *Arrington*, PIRG does not provide a "forum" for the expression of differing

---

11. The district court also found that "PIRG has two basic goals. One is to effect social and political change in the areas of its concern. PIRG's second goal is to involve university stu-

dents in public affairs so as to broaden their educational experiences and help develop a more sophisticated and active electorate." 516 F.Supp. at 1146.

views. Rather, PIRG's political stance is determined by its student Board of Directors, and students working for PIRG are foreclosed from supporting contrary positions unless such support is "okayed by the state board." Deposition of Edward Lloyd, Executive Director of New Jersey PIRG, Appendix at A621.[12] More important, PIRG—unlike the school newspaper under consideration in *Arrington*—is a "group"; the students who pay the PIRG fee are referred to in PIRG's literature as "constituents," Appendix at A699, and "members," Appendix at A754, A756. We note here that PIRG's ineligibility for student activity funds—precisely because of its independent status—distinguishes PIRG from the other groups on campus, which are funded by a standard "student activity fee." This fee, a lump sum used to subsidize a variety of student groups, can be perceived broadly as providing a "forum" for a diverse range of opinion. The PIRG fee, in contrast, was segregated from the other charges listed on the students' term bills, and provides support for only one organization.

To be sure, one by-product of PIRG is the education of its participants. But that end might also have been secured if the student-participants had worked for a political action group totally unconnected with RUCCAS, and yet it could not be seriously contended that student fees could be funneled to such a group. Put simply, the educational component of PIRG cannot serve to obscure the underlying substance of plaintiffs' complaint: that all RUCCAS students were obliged to finance what allegedly amounted not to a "classroom" to foster the effective presentation of the students' views, but rather to fund a political entity devoted to the attainment of certain fixed ideological objectives.

■ Although many student-related groups have ideological overtones, to the extent that the university determines that an organization is an appropriate participant in the total university forum, considerable deference should be accorded that judgment. This deference stems from the long-standing recognition that the university as a whole functions as a forum for the exchange of diverse views. As the Supreme Court has observed, "[t]he college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 273 n.5, 70 L.Ed.2d 440 (1981).[13] The holdings in *Veed* and *Arrington* thus correctly indicate that the university has broad latitude in providing an opportunity for students to participate in—and to oppose—the expression of a broad spectrum of ideology.

To overcome the presumptive validity of the university's judgment that an organization contributes to the university community, and to make out a prima facie case that exaction of the fee conflicts with the mandates of the first amendment, persons objecting to the fee must establish that the challenged group functions essentially as a political action group with only an incidental educational component. At that point the burden of producing evidence to counter the plaintiffs' showing or to otherwise demonstrate a compelling state interest shifts to the university. We do not rule out the possibility that, even in the face of an unrebutted prima facie showing, the university might demonstrate a compelling state

---

12. *See also* Appendix at A310 (deposition of plaintiff Joseph P. Galda):

> Q: Have you ever submitted a project proposal to your local board or to the State board or to any staff members of PIRG?
> A: I asked at the State headquarters one of the staff people if they would take a project by a pro-life group, and they said given the organization's feelings about abortion, they would not.

13. *See also Good v. Associated Students of the University of Washington*, 86 Wash.2d 94, 542 P.2d 762, 769 (1975) ("The cases which the university relies upon to sustain mandatory student fees recognize the delicate balance between the rights of the dissenters who must finance controversial programs and the desirability of the university providing a forum for wide-ranging ideas. Yet these cases are premised on the proposition that there must be in fact a spectrum presented, not a single track philosophy.").

interest by establishing the importance of the challenged group's contribution to the university forum.

In the present situation we must order a remand because the district judge did not have an opportunity to evaluate the plaintiffs' showing against the standards we have enunciated nor did the university have the opportunity to counter the plaintiffs' showing or otherwise set forth a compelling state interest.[14] And because differing inferences can be drawn from the existing record, there exists a genuine issue of material fact on the question whether the exaction of the PIRG fee infringes upon the first amendment rights of the plaintiffs. Given our conclusion in this regard, it is also necessary to consider whether PIRG's refund mechanism "cures" whatever infirmity might exist as the result of the compulsory exaction.

### B

On appeal, plaintiffs argue that, under *Abood*, a refund arrangement does not suffice to remedy a constitutionally defective funding scheme; it simply serves to create "a perpetual system of violations and possible repayments, paid in again, establishing new violations." Brief for Appellants at 15–16.

*Abood* explicitly refrained from addressing the question whether a refund mechanism is sufficient to render constitutional a fee-collection arrangement such as the one at issue here.[15] Stating that, in fashioning a remedy, "the objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees

who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities," 431 U.S. at 237, 97 S.Ct. at 1800, the Court pointed with approval to the remedies discussed in two prior cases, *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and *Brotherhood of Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct.1158, 10 L.Ed.2d 235 (1963). In *Street*, which established that "only employees who have affirmatively made known to the union their opposition to political uses of their funds are entitled to relief," 431 U.S. at 238, 97 S.Ct. at 1801, the Court outlined two possible remedies:

> first, "an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget"; and second, restitution of a fraction of union dues paid equal to the fraction of total union expenditures that were made for political purposes opposed by the employee.

*Id.* (quoting *Street*, 367 U.S. at 774–75, 81 S.Ct. at 1802–03). *Allen*, in contrast, intimated strongly that while a refund could cure past improper exactions of a fee, future exactions should be reduced, pro rata, prior to collection. There, the Court described a "practical decree" that could properly be entered, providing for: (1) the re-

---

**14.** The funding mechanism for PIRG differs from the funding of groups supported in part by the general student activity fee which are more directly under the university's umbrella. We need not decide the significance of the difference in funding mechanism, at least in first amendment terms. It may be, however, that an exploration of university funding policy will demonstrate that funding by the standard university student activity fee justifies greater insulation from scrutiny.

**15.** In *Abood*, the union had adopted an internal union remedy subsequent to the onset of litigation. The plan, which provided that a dissent-

ing employee may protest at the beginning of each school year the expenditure of any part of his agency-shop fee for political purposes, and then receive a pro rata refund, was not scrutinized by the court for constitutional infirmity:

> We express no view as to the constitutional sufficiency of the internal remedy described by the appellees. If the appellants initially resort to that remedy and ultimately conclude that it is constitutionally deficient in some respect, they would of course be entitled to judicial consideration of the adequacy of the remedy.

431 U.S. at 242 n.45, 97 S.Ct. at 1803 n.45.

fund of a portion of the exacted funds in the proportion that union political expenditures bear to total union expenditures, and (2) *the reduction of future exactions by the same proportion.*

*Abood,* then, provides somewhat inconclusive authority in support of plaintiffs' position. Justice Stevens appears to have recognized as much; he concurred in the opinion of the Court but stressed that a refund very well might not be adequate: "the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing *a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining.*" 431 U.S. at 244, 97 S.Ct. at 1804 (emphasis added).

A number of courts and commentators appear to agree with the observations by Justice Stevens that a funding system requiring continual payments and subsequent refunds to dissenters may not satisfy the requirements of the first amendment. In *KEPAC v. Kentucky Registry of Election Finance,* 110 L.R.R.M. 2398 (6th Cir. May 13, 1982), for example, the court approved a "reverse check-off" system in which employees, members of the Kentucky Education Association (KEA), had contributions to KEPAC, the political arm of KEA, deducted from their paychecks unless they affirmatively "checked off" that they declined to support KEPAC. If an employee failed to check off, but subsequently decided not to participate in KEPAC, he could stop future deductions and receive a refund

of past contributions. The fact that the employees could "check off" and thereby refuse to make donations to KEPAC in the first place was one factor that persuaded the court that the KEPAC funding scheme did not violate the rights of the dissenting members. 110 L.R.R.M. at 2404–05.

The KEPAC court compared the scheme at issue before it to that invalidated on statutory grounds in *Federal Election Commission v. National Education Association (NEA),* 457 F.Supp. 1102 (D.D.C.1978), in which a $1.00 annual political contribution was automatically deducted from each NEA member's paycheck; if the member did not wish to contribute, he was required to "submit a separate written request for a refund rather than being able to disallow its deduction in the first place." *Id.* at 1103–04. This system, declared the District Court, placed an undue burden on the dissenting employees. Unlike *Abood*—in which "it was reasonable to put the burden on the dissenter to come forward" because the fee at issue was a lump sum payment used to cover both collective bargaining and political activities—in *NEA,* the $1.00 political payment was segregated from dues, and thus "there is no comparable justification for placing the burden on the dissenter." *Id.* at 1107 (footnote omitted).[16]

We need not decide today whether, in a situation identical to that in *Abood,* a refund mechanism would be sufficient to cure an otherwise unconstitutional fee assessment. For, like the $1.00 fee invalidated in *NEA,* the fee collection arrangement at issue here would appear to provide little justification for á refund procedure (as op-

16.  *Cf. The Supreme Court, 1976 Term,* 91 Harv. L.Rev. 1, 198 (1977) (commentary on *Abood*) (footnotes omitted) (emphasis in original):

The method proposed by the majority for preventing impermissible infringements of individuals' rights is fair to both the union and the employees. Since a dissenter need merely manifest his objection to nonbargaining expenditures of *any* kind, he is required to object only once in order to preserve his associational rights. He thus does not have to monitor every expenditure made during any given period, and need not express against his will his position on any particular cause that the union advocates. In order to

effectuate fully the goals underlying *Abood,* a court also should require the union to prepare a schedule of estimated yearly disbursements before collecting fees from nonunion members in the future and to make this schedule available for inspection by all employees. Such a requirement will allow disputes concerning the permissibility of any given expenditure to be resolved *before* an employee has parted with his money but will not impose any undue hardship upon the union. There will thus be more assurance that inertia will not persuade a dissenter to relinquish his constitutionally protected right to freedom of association.

posed to permitting dissenters to withhold payment from the start) than did the scheme in *Abood*. In that case, at least a portion of the compulsory union dues could be justified "by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." 431 U.S. at 222, 97 S.Ct. at 1793. Thus, it might be argued that a refund was the only administratively practicable method by which the dissenter's rights in *Abood* could be recognized. Here, however, for purposes of summary judgment, we are required to assume that no compelling governmental interest can be shown that justifies the assessment of any portion of the PIRG fee.[17] In the absence of such a demonstrated interest, a fee used to finance political activity cannot be exacted—even temporarily—from those unwilling to pay.[18]

### IV

We hold, therefore, that the plaintiffs' allegations state a claim for relief under the first and fourteenth amendments. The judgment of the district court granting summary judgment for the defendants will be reversed and the case remanded for proceedings consistent with this opinion.[19]

---

17. The dissenters object to the *entire* fee; and under the University's refund system, the entire fee would have been returned to the dissenter upon request. We have been presented with no convincing reason—besides the obvious motive to procure additional funding from those students who do not wish to join PIRG but who are indifferent enough to forego seeking a refund—why PIRG could not obtain its financial support through purely voluntary contributions. In this regard, we perceive no constitutionally significant distinction between a "check-off" system, in which the student states that he or she wishes to support PIRG, and a "reverse check-off" system, in which the student states that he or she declines to support PIRG.

18. The district court concluded that any constitutional difficulties arising from the PIRG assessment were "redeemed" by Rutger's "adequate" refund arrangement. Apparently, a re-

quested refund was not forthcoming until the end of the semester in which the fee was paid; as a result, the fees collected in the fall semester allegedly were not returned until after the fees had been paid for the spring term. Thus, according to the plaintiffs, PIRG had the use of every student's money for virtually the entire school year. While this contention may have considerable merit, we of course need not consider it, given that we have concluded that even a temporary exaction of the PIRG fee from Rutgers' students cannot be justified on the present record.

19. On remand the district court may wish to reconsider plaintiffs' motion to compel discovery, as well as the district court's order denying plaintiffs motion for class certification. *See* Herbert B. Newberg, *Class Actions*, Ch. 3, § 1120h (1977).