702 F.2d 475
 9 Ed. Law Rep. 1158
 Richard J. KANIA, J.A. Kania, and Michael Morris on behalf
of themselves and all others similarly situated, Appellants,
v.
Christopher FORDHAM, William C. Friday, Board of Trustees of
UNC-CH and Board of Governors of UNC, Appellees.
 No. 82-1391.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 8, 1982.
Decided March 10, 1983.
 
 James M. Sullivan (Richard L. Voorhees, Gastonia, N.C., on brief), for appellants.
 Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen. of N.C., Raleigh, N.C., on brief), for appellees.
 Before MURNAGHAN, SPROUSE and ERVIN, Circuit Judges.
 ERVIN, Circuit Judge:
 
 
 1
 This appeal requires us to consider once again the constitutionality of the mandatory student fees imposed by the University of North Carolina at Chapel Hill. Specifically, the appellants, Richard and Jay Kania and Michael Morris, brought this action against officials of the University asserting that the partial funding of the University's student newspaper by the student fees compels them to advocate views with which they disagree, in violation of the fourteenth amendment.[1] We rejected this identical contention, raised by different plaintiffs, in Arrington v. Taylor, 380 F.Supp. 1348 (M.D.N.C.1974), aff'd mem., 526 F.2d 587 (4th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). After the Supreme Court decided Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Arrington plaintiffs' attorney petitioned this court to recall its mandate and reconsider its decision in light of Abood. That motion was denied, and the present action commenced. After oral argument, the district court granted the University's motion for summary judgment and Kania appealed. After a careful reconsideration of the constitutional issues presented, we have concluded that Arrington was correctly decided and, therefore, we affirm the decision below.[2]
 
 I.
 
 2
 The Daily Tar Heel is the student newspaper in Chapel Hill. Chief responsibility for its content and editorial policy lies in an editor elected by the student body and subject to recall. Although the University controls the business operations of the paper, the parties agree that the University administration exercises no control whatsoever over The Daily Tar Heel 's contents or editorials. The paper is independent of the University's School of Journalism. The Daily Tar Heel functions, with one significant exception, in the same fashion as an ordinary newspaper. It reports local and national news, university activities including sports, presents clearly designated editorials and opinion columns, and prints letters to the editor, subject to the paper's discretion and editing.
 
 
 3
 The one major factor differentiating The Daily Tar Heel from most daily newspapers is its funding. The Daily Tar Heel is distributed on campus without charge. Its subscription income (from alumni and nonstudents) is therefore quite small, totalling in the 1972-73 academic year approximately $2,000. During that period the paper collected around $85,000 in advertising receipts. The rest of its operating budget, in 1972-73 about $54,000, is derived from the University's student activities fees. These fees are mandatory; a student who refuses to pay them will not be given grades, transcripts or a diploma. The fees fund a variety of student organizations and activities, including other publications and a visiting speakers program. The University's student constitution provides that a minimum of sixteen per cent of the fees must be appropriated for The Daily Tar Heel, provided that the amount does not exceed one-third of the previous year's budget. Undisputed evidence showed that without partial funding by the student fees The Daily Tar Heel could not survive in its present form.[3]
 
 
 4
 Kania states that he disagrees with many of the editorial positions taken by The Daily Tar Heel and that opportunity to express this disagreement through letters to the editor is not freely available. The record, however, does not show any systematic discrimination against opposing viewpoints on the part of the newspaper's editors, and Kania admits that letters critical of the editors' opinions are often printed.
 
 II.
 
 5
 The gravamen of Kania's complaint is that the University,[4] by requiring him to subsidize the publication of views with which he disagrees, is infringing his constitutional immunity from coerced expression. See West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (state may not compel affirmation of opinion or belief). The district court rejected this contention on the basis of its conclusion that any incidental restriction on the economic ability of individual students to advance their own views is outweighed by the state interest advanced by The Daily Tar Heel. This state interest, the district court found, in Arrington and in the present case, is the vital role played by The Daily Tar Heel in the University's educational mission. The newspaper exposes "the student body to various points of view on significant issues, and [allows] students to express themselves on those issues." 380 F.Supp. at 1362. The Daily Tar Heel thus subserves the state's legitimate interest in creating the richest possible educational environment at the University and, in its role as a forum for the expression of differing viewpoints, is a vital instrument of the University's "marketplace of ideas." See Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). By creating the financial arrangements necessary for the newspaper's existence, the University has enhanced the ability of its students as a whole to express themselves. In the absence of any showing that the University uses its financial support as a means of censoring The Daily Tar Heel's content, or that its editors systematically suppress opposing viewpoints,[5] the district court held that the subsidization of the newspaper by mandatory student fees is constitutionally permissible. Accord, Veed v. Schwartzkopf, 353 F.Supp. 149 (D.Neb.1973), aff'd mem., 478 F.2d 1407 (8th Cir.1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974).
 
 III.
 
 6
 Kania maintains that even if Arrington reached a permissible result when first decided, it has been invalidated by subsequent Supreme Court elucidation of the constitutional doctrines of freedom of speech and association. He relies primarily on Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).[6] In that case, the Supreme Court unanimously held that a state cannot constitutionally compel public employees to contribute to union political activities to which they are opposed unless those activities are directly related to collective bargaining. Id. at 235-36, 97 S.Ct. at 1799-1800 (opinion of the Court); id. at 244, 97 S.Ct. at 1804 (Powell, J., concurring in the judgment). Abood involved a state labor law authorizing local governmental employees to organize unions. The statute permitted a union and a local governmental employer to agree to an "agency shop" arrangement requiring all represented employees either to belong to the union or pay a service fee equal in amount to union dues to the union. The Detroit Federation of Teachers and the Detroit Board of Education negotiated a labor contract including an agency shop clause, prompting several represented employees, some members of the union and some not, to file a class action in state court challenging the clause. The complaint alleged that the union carried on social activities for members only and engaged in various political, economic, and religious activities with which the plaintiffs disagreed, and that these activities were supported by the union dues/service fees plaintiffs were required to pay pursuant to the labor contract and the authorizing state statute. The state court of appeals held that the agency shop clause was not facially unconstitutional, and that the use of compulsory fees for political purposes could violate plaintiffs' rights but that plaintiffs had failed to demonstrate a right to any restitution because they had not informed the union of the causes to which they objected. 60 Mich.App. 92, 230 N.W.2d 322 (Mich.App.1975).
 
 
 7
 The United States Supreme Court vacated the Michigan court's judgment. The Court held that the use of mandatory union fees for the union's core functions--collective bargaining, contract administration and grievance adjustment--was constitutional. But the Court concluded that the union expenditure of funds obtained from plaintiffs by compulsion of law for political purposes "unrelated to its duties as exclusive bargaining representative," 431 U.S. at 234, 97 S.Ct. at 1799, amounted to government compulsion to support ideological causes as a condition of public employment. The Court reasoned that "[t]he fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights." Id. The Court declined to address the difficult issue of distinguishing legitimate collective bargaining activities from unrelated ideological ones, and suggested that if plaintiffs proved their allegations on remand, they might be entitled to an injunction against expenditures for political causes they oppose and restitution of funds exacted from them and spent on such causes.
 
 
 8
 Kania argues that Abood is directly analogous to this case and therefore controls its result. Just as the Abood plaintiffs' public employment was contingent on their financial support of the union, Kania is required to contribute financially to The Daily Tar Heel as a condition of enrollment at a public university. Since the newspaper is, in his opinion, a partisan advocate for political positions with which he disagrees, Kania maintains that he is being coerced unconstitutionally into advancing those positions.
 
 
 9
 In evaluating the impact of Abood on the validity of Arrington, it is necessary to focus attention on the specifics of the Supreme Court's decision. The Abood Court was concerned with labor relations in the public sector, not with the peculiar setting of a student newspaper in a public university.[7] Abood disapproved mandatory support for the union's ideological causes but specifically upheld the imposition of fees used by the union for its central purpose.[8] In this case, the University's imposition of student fees is not designed to further the University's ideological biases, but instead to support an independent student newspaper. The University's academic judgment is that the paper is a vital part of the University's educational mission, and that financing it is germane to the University's duties as an educational institution.[9] The Daily Tar Heel's financial need for mandatory fee support is established by undisputed testimony in the record and by the district court's findings of fact. It would appear, therefore, that funding by mandatory student fees is the least restrictive means of accomplishing an important part of the University's central purpose, the education of its students.
 
 
 10
 A second crucial distinction between Abood and the present case lies in the nature of the communications funded by the compulsory fees in the two cases. In Abood the plaintiffs alleged that they had no control over the Union's communications, and that these communications were one-sided presentations of the "Union viewpoint." The mandatory fees in Abood, therefore, enhanced the power of one, and only one, ideological group to further its political goals. In contrast, The Daily Tar Heel increases the overall exchange of information, ideas, and opinions on the campus. Government may abridge incidentally individual rights of free speech and association when engaged in furthering the constitutional goal of "uninhibited, robust, and wide-open" expression. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See generally Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (certain incidental infringements of rights of association constitutional in context of federal campaign finance statute tailored ultimately to enhance openness of political discussion and activity); but see First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (state statute limiting corporate speech unconstitutional; state failed to show that the restriction was necessary to purify or keep open public debate). We conclude, therefore, that in the particular situation presented by this litigation, the minimal and indirect restriction on Kania's constitutional rights worked by the University's funding of The Daily Tar Heel does not violate the fourteenth amendment.[10]IV.
 
 
 11
 We conclude that our holding in Arrington v. Taylor remains viable after the Supreme Court's decision in Abood v. Detroit Board of Education, and that the University's partial funding of its student newspaper through mandatory student fees is constitutional. The judgment of the district court, therefore, is affirmed.
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 The Kanias and Morris were, at the time the action was begun, all students at the University, and at least one of them is still enrolled there. For the sake of brevity, they will be referred to hereinafter as "Kania." The defendant officials will be styled "the University."
 
 
 [2]
 The district court correctly denied the University's motions to dismiss and for summary judgment on res judicata /collateral estoppel grounds. After Abood, it was conceivable that the Arrington decision was wrong under current constitutional doctrine; the University, a state instrumentality, should not be allowed to hide behind that judgment with the possible result that individual constitutional liberties are denied. Relitigation of an issue of public importance should not be precluded when there has been "an intervening change in the applicable legal context." Restatement (Second) of Judgments Sec. 28(2)(b) (1980)
 
 
 [3]
 The student fee since 1978 for the nine-month academic year has been $23.00 for undergraduate and $19.00 for graduate students. In the 1978-79 academic year, student fees totalling $444,349 were collected; of this amount, $69,640 had been disbursed to The Daily Tar Heel by March 30, 1979. There is no evidence in the record to contradict the inference arising from these figures that the total disbursement to the newspaper in 1978-79 was around $90,000, or approximately twenty per cent of the fees collected. In 1978-79 an undergraduate, therefore, was compelled to contribute a maximum of about $4.60 to viewpoints of The Daily Tar Heel with which he or she disagreed, assuming improbably that the student disagreed with the entire contents of every issue of the newspaper. While the state may not abridge constitutional liberties arbitrarily merely because the abridgement is slight, see Schad v. Mt. Ephraim, 452 U.S. 61, 68 n. 7, 101 S.Ct. 2176, 2183 n. 7, 68 L.Ed.2d 671 (1981) (close scrutiny of governmental action necessary even when free expression is restricted only incidentally or in a small number of cases), the extent of the abridgement is properly considered in striking the constitutional balance between the educational goals of a state university and the speech and association rights of its students. See Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (fourteenth amendment permits this balance)
 
 
 [4]
 In this appeal the University does not contest the applicability of constitutional limitations to its mandatory student fee arrangements. See Arrington, 380 F.Supp. at 1359-1360
 
 
 [5]
 The University could not compel The Daily Tar Heel to provide equal access to those disagreeing with its editorial positions without running afoul of the constitutional guarantee of freedom of the press. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). See also Papish v. Board of Curators of University of Missouri, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (recognizing that the student press is entitled to the same general protections afforded privately owned newspapers)
 
 
 [6]
 Kania cites two other recent Supreme Court decisions which he argues cast doubt on Arrington. In Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court held that the dismissal by an incoming Democratic sheriff of Republican employees of the sheriff's office because of their party affiliation violated the employees' constitutionally protected freedom of speech and association. Kania relies on Elrod primarily for the statement in the three-justice plurality opinion that "[p]atronage, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.' " Id. at 357, 96 S.Ct. at 2681, quoting Illinois State Employees Union v. Lewis, 473 F.2d 561, 576 (7th Cir.1972). He asserts that mandatory student funding of The Daily Tar Heel compels and restrains "belief and association" by forcing students to support financially certain viewpoints and groups, those endorsed by The Daily Tar Heel's editors, thereby reducing the funds available to back other viewpoints and groups. He ignores the fact that six of the justices participating in Elrod explicitly agreed that some incidental infringement of constitutional liberties was acceptable if it was pursuant to the least restrictive means of furthering some vital governmental interest. 427 U.S. at 360-73, 96 S.Ct. at 2683-89 (plurality opinion of Brennan, J.); id. at 381-88, 96 S.Ct. at 2693-96 (Powell, J., dissenting). Elrod is a two-edged sword: although its statement of broad first amendment principles provides at least rhetorical support for appellants' position, its recognition that some incidental infringement of those principles in the pursuit of vital government ends is acceptable supports the University's position that the minor encroachment on appellants' freedom in this case, see footnote 3, supra, is justified by The Daily Tar Heel's essential role in the University's, and the state's, vital goal of education
 The second case that Kania cites is Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), in which, at the behest of a Jehovah's Witness, the Court invalidated a state statute making it a criminal offense to conceal the state motto "Live Free or Die" imprinted on state automobile license plates. The appellants here stress that the Wooley Court accepted without question the proposition that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." Id. at 714, 97 S.Ct. at 1435 (emphasis supplied). But aside from this general principle, with which the University has no quarrel, Wooley is almost totally irrelevant to Kania's claim. As the Supreme Court noted, the statute challenged in Wooley "in effect requires that appellees use their private property as a 'mobile billboard' for the state's ideological message." Id. at 715, 97 S.Ct. at 1435. Such state compulsion-to-speak clearly implicated constitutional guarantees of freedom of thought and expression, and therefore the Court examined the proffered countervailing state interests. The Court dismissed one alleged interest--the facilitation of identification of cars--as almost incredible. The Court found the other interest--the state's desire to communicate its official views on history, state pride and individualism--to be an ideological justification that could not override the individual's right to dissent. Id. at 716-17, 97 S.Ct. at 1436.
 On the other hand, in the present case, Kania in no way is being compelled to serve as "courier for [the state's or The Daily Tar Heel 's] message," id. at 717, 97 S.Ct. at 1436. The district court found that The Daily Tar Heel is not, and is not perceived as, the official voice of those whose student fees support it. 380 F.Supp. at 1362. Furthermore, the University is not attempting to utilize the paper as a means for disseminating an official ideology; the evidence is undisputed that the University exercises no control over the paper's contents or editorial policies.
 Finally, the district court also found as facts that The Daily Tar Heel performs a vital educational role, and that the present funding system is essential to the preservation of that role. These findings are not clearly erroneous and serve to distinguish the present case from Wooley.
 
 
 [7]
 The Supreme Court recently reviewed the special nature of the public university:
 This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum. "The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.' " Moreover, the capacity of a group or individual "to participate in the intellectual give and take of campus debate [would be] limited by denial of access to the customary media for communicating with the administration, faculty members, and other students."
 Widmar v. Vincent, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440, 446 n. 5 (1981), quoting Healy v. James, 408 U.S. 169, 180, 181-82, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972).
 
 
 [8]
 "The decision in Abood did not uphold any right of a non-member to withhold contributions from the cost of communicative activities with which the non-member disagrees, so long as such activities are germane to the union's duties as collective bargaining representative." L. Tribe, American Constitutional Law 589 n. 5 (1978)
 
 
 [9]
 In his separate opinion in Widmar v. Vincent, Justice Stevens observed that public universities by their very nature must
 routinely make countless decisions based on the content of communicative materials. They select books for inclusion in the library, they hire professors on the basis of their academic philosophies, they select courses for inclusion in the curriculum, and they reward scholars for what they have written. In addition, in encouraging students to participate in extracurricular activities, they necessarily make decisions concerning the content of those activities.
 * * *
 Judgments of this kind should be made by academicians, not by federal judges.
 454 U.S. at 278-279, 102 S.Ct. at 279, 70 L.Ed.2d at 453 (Stevens, J., concurring in the judgment). See also id. at 275-276, 102 S.Ct. at 277-278, 70 L.Ed.2d 451-52 (opinion of the Court). Such decisions, financed in part by tuition fees imposed on students, have as their unavoidable by-product the result of advancing some viewpoints and not others. While public universities may not seek by these exercises of academic judgment to establish an ideological orthodoxy or to stifle disagreement, they need not--indeed cannot--avoid using funds paid by students for purposes which, at times, incidentally result in the furtherance of goals opposed by some of those students.
 
 
 [10]
 In Galda v. Bloustein, 686 F.2d 159 (3d Cir.1982), the court of appeals found a state university's funding of a politically active social action organization out of mandatory student fees constitutionally questionable despite the existence of a refund mechanism by which students who disapproved of the organization's activities could recover that part of their fees designated for the organization. The court held that the funding arrangement might violate of the constitutional principle established in Abood. Because of the procedural posture of the case--the district court had granted the defendant university officials summary judgment--the court of appeals assumed that the university could show no compelling governmental interest for imposition of the fees, and therefore concluded that the district court's reliance on the refund mechanism was misplaced
 While noting that Abood arguably cast doubt on the continuing validity of Arrington, the Third Circuit found Galda and Arrington readily distinguishable. Unlike the students in Arrington, whose funds were used to support "a 'forum' for a diverse range of opinion," the Galda plaintiffs were being compelled "to fund a political entity devoted to the attainment of certain fixed ideological objectives." Id. at 166. The court concluded that "Arrington thus correctly indicate[s] that the university has broad latitude in providing an opportunity for students to participate in--and to oppose--the expression of a broad spectrum of ideology.... [P]ersons objecting to the fee must establish that the challenged group functions essentially as a political action group with only an incidental educational component." Id. We perceive no conflict between the holding in Galda as distinguished by that court from Arrington and our decision in the present case.