[No. 43073.     En Banc.     November 20, 1975.]

BONNIE GOOD, ET AL, *Appellants*, v. ASSOCIATED STUDENTS OF THE UNIVERSITY OF WASHINGTON, ET AL, *Respondents*.

*Richard B. Sanders*, for appellants.

*Slade Gorton, Attorney General*, by *Gerald L. Coe, Assistant*, for respondents.

BRACHTENBACH, J.—This is an action by three University of Washington students, individually and as representatives of a class, against the University of Washington (U of W), its regents, the Associated Students of the University of Washington (ASUW) and others. The controversy stems from required student membership in the ASUW, the activities of that organization and the financial support thereof by the university through a mandatory services and activities fee, a portion of which is allocated to the ASUW.

The plaintiffs seek to enjoin collection and distribution of the services and activities fee, to enjoin payment of that fee as a prerequisite to enrollment and to require the university to establish a fund for reimbursement of fees unlawfully or wrongfully collected. The trial court granted defendants' motion for summary judgment. We reverse and remand.

All full time students at the U of W are charged a mandatory services and activities fee. For example, in the 1969-70 academic year the fee was $35 per quarter with $3.50 allocated to the ASUW. In 1971-72, the fee was $37, with $2.50 going to the ASUW. The ASUW was incorporated as a nonprofit corporation in 1906. The articles of incorporation provide that all registered students who have paid the students' annual fee shall be members of the corporation. The ASUW bylaws amplify that "All regularly enrolled full-time students of the University of Washington who have paid supporting fees established by the Board of Regents shall be members of the Association."

The formal governing body of the ASUW is a board of control, elected by student members of the corporation. The factual and legal relationship between the U of W and the ASUW will be discussed later.

The ASUW engages in a number of activities, such as sponsoring campus speakers, cultural events involving art, music and drama, and film services. The association provides various services ranging from poster making facilities to a distribution of a contraception handbook. The record fails to detail the amount of financial support for each of the various functions performed.

The plaintiffs complain that the ASUW has consistently promoted a one-sided political viewpoint, both in its choice of speakers and in taking public positions on various controversial topics. As far as this latter is concerned, the record discloses resolutions from the ASUW supporting activities in Berkeley, California, to establish a "people's park," endorsement of a bill to ban throwaway beverage containers, support against the shipment of nerve gas through Washington, condemnation of drilling for oil in Puget Sound, protest of the actions of a grand jury in Ohio, support of the activities of the United Farm Workers in organizing the lettuce industry in California, and opposition to the invasion of Laos.

Plaintiffs also complain about expenditures for such things as paying $320 to two California student body presidents for legal defense and bail bonds for students involved in the "people's park" controversy, rent for an off-campus "drop in" center, a $9,000 loan to the student yacht club, contribution of $550 to the Viet Nam war moratorium, $500 to the intercollegiate political affairs commission to support an information center in Olympia during a special session of the legislature, payment of $100 to the National Student Association Center for Student Legal Rights, $50 to assist in the lettuce boycott, $1,527 for speakers at a war moratorium meeting, and $500 to the antiwar fall offensive.

Plaintiffs raise two primary issues: (1) Does the university have the authority to allocate funds to the ASUW? (2) Are students' First Amendment rights violated by (a) the requirement that they be members of the ASUW; (b) that they are charged a fee to support the ASUW?

With respect to the issue of the university's authority to

fund the ASUW, plaintiffs first argue that the board of regents has no statutory authority to make such an allocation of student fees. We disagree. RCW Title 28B, the higher education code, grants to the board extensive and quite general powers. For example, RCW 28B.20.100 provides that the government of the university shall be vested in a board of regents. RCW 28B.20.130 provides that the board shall have "full control of the university and its property." Directed by RCW 28B.15.100 to collect from students a services and activities fee, the board has been granted broad discretion as to how such fees are to be used. RCW 28B.15.041 provides that the services and activities fee shall be used "as otherwise provided by law or by rule or regulation of the board of . . . regents . . . for the express purpose of funding student activities and programs of their particular institution."

■ We believe that the range of powers given to the board is sufficiently wide to encompass their decision to provide student activities and services through a separate nonprofit corporation, so long as that entity is in essence an agency of the university and subject to ultimate control by the board. This view is buttressed by the fact that the legislature is well aware of the corporate nature of the ASUW.

A 1956 report to the Legislative Council by a subcommittee on education discussed the relationship between the regents and the corporate ASUW and even quoted from the articles of incorporation. The corporate status of the ASUW was disclosed also in an attorney general's opinion which concluded that it was an arm and agency of the university and thus the state. Attorney General Opinion, May 10, 1956. That opinion further revealed to the state senator to whom it was written that two superior court lawsuits decided in the 1930's had reached a similar conclusion. An additional indication that the legislature is aware that the ASUW maintains a corporate identity separate from (though intimately connected with) the university is found in RCW

28B.10.640, which authorizes the association to contract for certain purchases and services.

It is clear that the ASUW is subject to ultimate control by the regents. The bylaws of the ASUW include the following:

Since the government of the University of Washington is vested in a Board of Regents, the Board of Regents has delegated to the President of the University authority to formulate rules incident to the management of student affairs, all action taken by the Associated Students of the University of Washington (ASUW) shall be consistent with University rules as well as with all provisions in the Articles of Incorporation of the Associated Students of the University of Washington.

Further those bylaws state:

The members of the ASUW recognize that the ASUW is an integral part of the University of Washington, that the ASUW exercises power delegated to it by the University, and that the President of the University, acting for the Board of Regents, therefore has the right of final approval of or disapproval of all actions of the ASUW and its governing body and agent or agencies.

The Board of Regents in 1962 issued a policy statement affirming its conviction that

a high degree of initiative and responsibility should be left to the ASUW organs of student government . . . [T]he experience in voluntary participation and in the decision making of student government is itself a valuable adjunct for students to the formal educational curriculum of the University. The Board wishes this aspect of student life to remain as free as possible, subject only to the final authority of the President to intervene in accordance with his powers described in the Articles of Incorporation and the Constitution of the ASUW . . .

When the president of the university, acting for the regents, approved the bylaws of the ASUW, his approval was specifically made subject to the rules and regulations of the university. But plaintiffs contend that legally the members of the corporation, the students, can amend the articles or bylaws and did in fact recently repeal a provision in the

articles which recognized the right of the university president to approve or disapprove all actions of the ASUW. Obviously the students were testing the water in their relationship with the university administration. While they did repeal such a provision, they were forewarned by the vice president for student affairs that the article was desirable because it reminded all parties of the underlying authority of the Board of Regents. However, he said it was not essential, because if its elimination represented a desire to change the basic functions of the ASUW or to reject the present relationship of authority, then the university would have to reexamine its position and take whatever steps might be necessary to assure that legal requirements and the ultimate authority of the regents and president would continue to be respected.

Plaintiffs counter with the argument that the university, in fact, has never initiated, altered or terminated any ASUW activity, program or position and, therefore, it is not an arm and agency of the university, but an independent entity. Failure to exercise a power which is statutorily vested in a body such as the regents does not mean that the power does not exist. The statutes grant the regents ultimate control over student services and activities programs. The regents have acknowledged and asserted that power in their policy statements. The ASUW bylaws recognize where final authority is vested. Use of that power and authority lies within the judgment of the regents.

The legislature has generally directed the purposes for which these fees may be expended:

> Services and activities fees shall be used as otherwise provided by law or by rule or regulation of the board of trustees or regents of each of the state's colleges or universities for the express purpose of funding student activities and programs of their particular institution.

RCW 28B.15.041. Whether the ASUW has exceeded these statutory purposes is a factual matter not determined by the record in its present state. Additional evidence will be necessary for the trial court to resolve this issue. Later

herein we will address the appropriate relief to be granted if it is found that expenditures have been made for purposes beyond those authorized by statute. Our holding necessarily causes to fail plaintiffs' contentions that there is a gift of public money or a prohibited state interest in a corporation.

However, there remains plaintiffs' assertion that their First Amendment rights have been violated by the requirement of mandatory membership in the ASUW and financial support thereof. The main thrust of plaintiffs' position is that they have a constitutionally protected right to *not* associate with any group, just as they enjoin a concomitant right to associate with any group of their choice. We agree.

Nowhere in the constitution does it mention the individual's right to associate with others in whatever form, political party, group or otherwise, to advance or oppose beliefs or ideas. Nonetheless that right is firmly established as an essential method of implementation and exercise of First Amendment guarantees. The court in *Griswold v. Connecticut*, 381 U.S. 479, 483, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965), said:

> The right of "association," like the right of belief . . . is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful.

*NAACP v. Alabama*, 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958); *Aptheker v. Secretary of State*, 378 U.S. 500, 12 L. Ed. 2d 992, 84 S. Ct. 1659 (1964); *Coates v. Cincinnati*, 402 U.S. 611, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971); *Healy v. James*, 408 U.S. 169, 33 L. Ed. 2d 266, 92 S. Ct. 2338 (1972); C. Rice, *Freedom of Association* (1962).

Freedom to associate carries with it a corresponding right to not associate. We have not been cited, nor have we discovered, a case which squarely holds that the right of

nonassociation is as much protected as the right of association. Various writers assert the proposition, apparently deeming it to be self-evident. C. Rice, *Freedom of Association*, xviii and 88 (1962); 21 U. Miami L. Rev. 791, 808 (1967); 56 Nw. U.L. Rev. 777, 778 (1962).

There are judicial expressions, in dicta and dissents, which recognize the freedom from forced association. For example, in *Ex parte Smith*, 135 Mo. 223, 227, 36 S.W. 628 (1896), it was said: "We deny the power of any legislative body in this country to choose for our citizens whom their associates shall be."

In apparent dictum, the United States Supreme Court in *Gilmore v. Montgomery*, 417 U.S. 556, 41 L. Ed. 2d 304, 94 S. Ct. 2416, 2427 (1974), quoted from an earlier dissent by Justice Douglas as follows: "Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires." In dissenting in *International Ass'n of Machinists v. Street*, 367 U.S. 740, 6 L. Ed. 2d 1141, 81 S. Ct. 1784 (1961), Justice Black said at page 791:

> Our Government has no more power to compel individuals to support union programs or union publications than it has to compel the support of political programs, employer programs or church programs. And the First Amendment, fairly construed, deprives the Government of all power to make any person pay out one single penny against his will to be used in any way to advocate doctrines or views he is against, whether economic, scientific, political, religious or any other.

Again in dissent, Justice Douglas said in *Lathrop v. Donohue*, 367 U.S. 820, 881, 6 L. Ed. 2d 1191, 81 S. Ct. 1826 (1961):

> The right of association is an important incident of First Amendment rights. The right to belong—or not to belong—is deep in the American tradition.

The Supreme Court has struggled with this concept in a series of cases involving mandatory union membership and, in one instance, an integrated bar association, but has not

met the issue head on. In *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 93 L. Ed. 212, 69 S. Ct. 251 (1949), and *AFL v. American Sash & Door Co.*, 335 U.S. 538, 93 L. Ed. 222, 69 S. Ct. 258 (1949), the court upheld right-to-work laws, that is, no compulsory union membership via a closed shop agreement, with only casual reference to association rights. From those cases Professor Rice concluded that the court inferentially placed the freedom not to associate on a plane of equality with the positive freedom to associate. C. Rice, *Freedom of Association*, 88 (1962).

The problem next arose in *Railway Employes' Dept., AFL v. Hanson*, 351 U.S. 225, 100 L. Ed. 1112, 76 S. Ct. 714 (1956), where the court upheld federal legislation authorizing union shop agreements between interstate railroads and the unions of their employees. The court expressly reserved the issue of First Amendment violations as not being presented by the record.

The reserved question was squarely before the court in *International Ass'n of Machinists v. Street*, 367 U.S. 740, 6 L. Ed. 2d 1141, 81 S. Ct. 1784 (1961), where it was alleged that the plaintiff employees were required, as a condition of continued employment, to join the union and pay various dues and assessments. Portions of the charges were used to finance political campaigns of candidates whom plaintiffs opposed and to promote political and economic doctrines with which they disagreed. The court acknowledged that the constitutional questions reserved in *Hanson* were of the utmost gravity, but neatly sidestepped the issue upon the principle that it would avoid unnecessary constitutional decisions by first ascertaining whether a construction of the statute was fairly possible by which the constitutional questions could be avoided. The court then proceeded with a statutory interpretation which held that the federal act only contemplated that union members would share the cost of negotiating and administering collective agreements and the costs of the adjustment and settlement of disputes, but that congressional intent did not allow the unions to

force employees, over their objection, to support political causes which they oppose. In a concurring opinion, Justice Douglas said that some forced associations are inevitable in an industrial society. He noted that all that *Hanson* had decided, which he wrote, was that the law could require all who gained from collective bargaining to contribute to its cost, but pointed out that the use of the members' funds for political purposes subordinates First Amendment rights. He quoted from Jefferson's writings as follows: " 'that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves is sinful and tyrannical.' . . . Brant, Madison, The Nationalist (1948), p. 354." *International Ass'n of Machinists v. Street, supra* at 778 n.4. In dissent, Justice Black decried the majority's avoidance of the constitutional issue. He found the legislation to be patently unconstitutional, commenting

> [The First Amendment] leaves the Federal Government no power whatever to compel one man to expend his energy, his time or his money to advance the fortunes of candidates he would like to see defeated or to urge ideologies and causes he believes would be hurtful to the country.

*International Ass'n of Machinists v. Street, supra* at 790.

Decided the same day as the *Machinists* case, was *Lathrop v. Donohue*, 367 U.S. 820, 6 L. Ed. 2d 1191, 81 S. Ct. 1826 (1961), where the plaintiff contended that mandatory membership in the Wisconsin Bar Association was unconstitutional. In a curiously reasoned, rambling opinion, the court found a strong public purpose in an integrated bar, that the bar's legislative activities were minimal, and concluded they were confronted only with the question of, compelled financial support of group activities, not with involuntary membership. The court decided that the record did not allow consideration of the constitutional question of impingement of the plaintiff's free speech. The difficulty with the case is summarized by Justice Black's dissent at page 865:

> I do not believe that either the bench, the bar or the

litigants will know what has been decided in this case—certainly I do not.

Both Justices Black and Douglas argued in their dissents that the forced association and economic support of opposed views violated the First Amendment.

■ Notwithstanding the convolutions of the above opinions of the United States Supreme Court, we have no hesitancy in holding that the State, through the university, may not compel membership in an association, such as the ASUW, which purports to represent *all* the students at the university, including these plaintiffs. That association expends funds for political and economic causes to which the dissenters object and promotes and espouses political, social and economic philosophies which the dissenters find repugnant to their own views. There is no room in the First Amendment for such absolute compulsory support, advocation and representation. We recognize that First Amendment rights are not absolute, but the university presents no arguments or facts to justify any exception, narrow as it would have to be, which might exist if a compelling state interest were presented.

Thus we hold that the university may not mandate membership of a student in the ASUW.

It does not follow, however, that plaintiffs cannot be required to pay a mandatory services and activities fee. The legislature has directed the regents to charge such fee, RCW 28B.15.100, and in so doing the legislature acted within its authority. *Litchman v. Shannon*, 90 Wash. 186, 155 P. 783 (1916).

Remaining is the issue whether these fees may be used for purposes to which plaintiffs object.

At this point we must balance the plaintiffs' First Amendment rights against the traditional need and desirability of the university to provide an atmosphere of learning, debate, dissent and controversy. Neither is absolute. If we allow mandatory financial support to be unchecked, the plaintiffs' rights may be meaningless. On the other hand if we allow dissenters to withhold the minimal financial con-

tributions required we would permit a possible minority view to destroy or cripple a valuable learning adjunct of university life. With these balancing principles in mind, we proceed.

When a student enrolls at a university he or she enters an academic community—a world which allows the teaching, advocacy and dissemination of an infinite range of ideas, theories and beliefs. They may be controversial or traditional, radical or conformist. But the university is the arena in which accepted, discounted—even repugnant—beliefs, opinions and ideas challenge each other. In this tradition, the regents have decided to grant the ASUW a high degree of initiative and responsibility in conducting its affairs.

Dissenting students should not have the right to veto every event, speech or program with which they disagree. On the other hand, the ASUW is not totally unchecked in its use of these fees mandatorily extracted from students. First, it must not exceed the statutory purposes discussed above. Second, it cannot become the vehicle for the promotion of one particular viewpoint, political, social, economic or religious.

The cases which the university relies upon to sustain mandatory student fees recognize the delicate balance between the rights of the dissenters who must finance controversial programs and the desirability of the university providing a forum for wide-ranging ideas. Yet these cases are premised on the proposition that there must be in fact a spectrum presented, not a single track philosophy. In *Veed v. Schwartzkopf*, 353 F. Supp. 149 (D. Neb. 1973), affirmed without opinion, 478 F.2d 1407 (1973), *cert. denied*, 414 U.S. 1135 (1974), the court said at page 152:

> Whether such activities in fact are educational in nature is for the Board of Regents to determine, subject only to the limitations that the determination be not arbitrary or capricious and that it not have the effect of imposing upon the student the acceptance or practice of religious, political or personal views repugnant to him or chilling his exercise of his constitutional rights.

Likewise in *Larson v. Board of Regents*, 189 Neb. 688, 690, 204 N.W.2d 568 (1973), the court held:

[T]he fact that the plaintiffs may disagree with the views expressed by some of the speakers brought to the campus is not controlling. If such views are expressed only as a part of the exchange of ideas and there is no limitation or control imposed so that only one point of view is expressed through the program, there is no violation of the constitutional rights of the plaintiffs. Within reasonable limits, it is appropriate that many different points of view be presented to the students. . . . The plaintiffs' evidence does not support their assertion that the entire activity has been directed toward a particular point of view.

. . .

. . . Where a university newspaper is supported by mandatory student fees, or by other university funds, reasonable supervision is required by the university authorities with a view to promoting and permitting the reflection of a broad spectrum of university life and reasonable representation of the various aspects of student thought and action.

As indicated above there is a factual issue as to whether the ASUW has exceeded the statutory purposes contained in RCW 28B.15.041. The other material issue of fact is whether the Board of Regents, acting through its appropriate personnel, has failed to enforce its "guidelines relating to the expenditure of public funds and the use of university facilities by the ASUW and other affected organizations," which guidelines are dated March 23, 1971. In paragraph 3 of those guidelines, dealing with the subject of ASUW program management, it is stated:

3. It is recognized that educational programs are among the services the ASUW may provide for the benefit of its members. The ASUW has the responsibility to present its programs fairly and in such a manner as to ensure that through its programming activities, it does not devote public funds or property for other than public purposes.

Of related interest is a sentence taken from the preamble to the guidelines which reads:

University facilities available for use by the ASUW and

other organizations, as well as ASUW funds, must be considered public in nature and subject to the statutory and constitutional limitations as to their use and management to which all public facilities and funds are subject, in addition to such limitations as the Board of Regents or its authorized representatives might impose and those contained in the ASUW's Articles of Incorporation. Student senates, and ASUW commissions, agencies, and other component units similarly funded by the ASUW are as subject to the obligations and limitations set forth in these guidelines as is the ASUW.

Thus the trial court must determine whether the manner in which the university has discharged its obligation to enforce its own guidelines constituted a violation of those guidelines or constitutes an abuse of discretion vested in the university to determine whether the guidelines have been violated. Recognizing the balancing of competing interests, the court must determine whether the particular violations found, if any, are of such magnitude as to require mandatorily the stopping of such violations. Thus if the violations exhibit a pattern of neglect to supervise, it might fairly be said that the university is not enforcing its own guidelines and in effect has adopted a policy of not doing so. On the other hand, if there have been some violations and the university, in the exercise of its discretion, has determined that they are not so serious as to require intervention and thus help defeat the purpose of the guidelines, then that is another matter. The relief in such a case is not to require that funds spent for these occasional departures must be reimbursed to those who have paid their student activities fees. All that might be required is that the funds spent be returned to the ASUW and used for the lawful purposes of the ASUW.

Until these factual matters are resolved by the trial court we cannot decree the full extent of relief to be granted. We have pointed out that it would be inappropriate to totally enjoin the collection of fees or their allocation to the ASUW. Whether the defendants should be required to establish a fund from which each plaintiff, including the

class, would be reimbursed for present and past fees unlawfully or wrongfully collected cannot be answered at this stage. We point out that the status of this case as a class action is not before this court. There is only passing reference in the record to the determination and establishment of a class, as required by the rules, and we are unable to pass upon that issue.

Within the guidelines established by this opinion, the trial court should also determine whether the plaintiffs, or the class if properly established, are entitled to any reimbursement.

Finally, the trial court denied the plaintiffs' motion to compel answers to certain interrogatories. In view of our holdings herein, it appears that many of those interrogatories are pertinent and additional discovery may be justified. The trial court should evaluate the interrogatories, further interrogatories and additional discovery in light of this opinion.

This case is remanded to the superior court for further proceedings consistent with this opinion.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, UTTER, and HOROWITZ, JJ., concur.