Ernest BESIG, Preston Cook, and Lidia La Garda, Plaintiffs-Appellants,

v.

The DOLPHIN BOATING AND SWIMMING CLUB, et al., Defendants-Appellees.

No. 81–4285.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 1982.

Decided Aug. 12, 1982.

As Corrected Aug. 20, 1982.

Sandra Terzian-Feliz, Terzian-Feliz & Cabraser, Fairfax, Cal., for plaintiffs-appellants.

Paula Jesson, Deputy City Atty., Derek B. Jacobson, McGuinn, Hillsman & Palefsky, San Francisco, Cal., for defendants-appellees.

Before BROWNING, Chief Judge, WRIGHT and TRASK, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The Dolphin Boating and Swimming Club and the South End Rowing Club are nonprofit organizations, which operate for the "advancement of rowing, running, swimming and other aquatic sports." They provide boats, boathouses, and launch facilities. The buildings contain showers and sauna rooms to accommodate cold salt-water swimming activities. The clubs have lockers, handball courts, and weight lifting equipment. They sponsor public-interest and charitable events and several long distance swim competitions, including the New Year's Day Alcatraz Swim.

Since 1938 the clubs have occupied land in San Francisco commonly known as Aquatic Park. The park property is owned by the City and County of San Francisco (the City) pursuant to the state's 1923 grant of the land. The City Charter gives the San Francisco Recreation and Park Commission complete and exclusive management control over the City's park property, including that occupied by the clubs.

For most of their history, the clubs maintained discriminatory by-laws and admissions policies. Only members were permitted to use club facilities, and membership was limited. The clubs excluded all women. They required sponsors, personal interviews, and a vote of governing boards to approve an applicant for membership. These practices resulted in exclusively white, male memberships.

Located adjacent to Dolphin and South End Clubs was the now-defunct San Francisco Rowing Club. In 1974 several women applied for membership but were denied. Many of these were bay swimmers who needed a safe place to change clothes and store belongings while swimming and to shower and warm up after emerging from the bay. At the time, public facilities nearby suffered frequent vandalism and subjected users to the risk of assault and attack.

The women sued the club in state court. *Arian v. San Francisco Rowing Club*, No. 682-926 (San Francisco Super.Ct., filed Nov. 27, 1974). The City was named as a defendant, but the City Attorney initially believed the dispute to be solely between the club and plaintiffs, with the City carrying no responsibility for the club's discrimination. No one informed the Park Commission of the suit.

After two years without results, in 1976 the *Arian* plaintiffs acquired a new attorney, and the City assigned another lawyer to the case. The City Attorney's office informed the Park Commission of the litigation and conceded to plaintiffs that membership discrimination by the club was improper.

Soon thereafter the Park Commission adopted a nondiscrimination resolution, which prohibited discriminatory practices by park lessees and concessionaires. The San Francisco Rowing Club refused to comply with that resolution and was evicted.

The Dolphin and South End Clubs revised their by-laws in response to the Park Commission's nondiscrimination resolution, but increased their initiation fees and otherwise continued to discourage the admission of women members.

In December 1976, Marilyn Rodman, one of the original *Arian* plaintiffs, filed an action in federal district court. She sought admission to the Dolphin Club for herself and all other women who applied.

The Dolphin Club admitted Rodman in March 1977. Over the next few months, Rodman, her attorney, the City Attorney's office, and the Dolphin Club negotiated over the Dolphin Club's compliance with the nondiscrimination resolution, structural modifications to accommodate women members, and formal amendment of the club's by-laws. The parties reported periodically to the Commission, and the court monitored their progress.

By September 1977 both clubs had amended their by-laws and were in compliance with the Park Commission's nondiscrimination policy. Rodman was a member and was satisfied that her objectives had been fulfilled. The parties' protracted efforts to agree on and implement satisfactory membership procedures had been successful.

Rodman's attorney continued to press suit and to appear before the Park Commission, raising the issue of broader public access to the clubs. She advocated the transfer of the Aquatic Park property to the Department of the Interior for inclusion in the Golden Gate National Recreation Area, a plan that could have succeeded only by the removal of the clubs' buildings from the property.

When Rodman discovered her attorney's transformation of the suit from one seeking nondiscriminatory membership opportunities to one potentially requiring the termination of the clubs, she withdrew from the action.

The plan to deed the property to the Golden Gate National Recreational Area failed and was abandoned in October 1977. Consequently, the Park Commission requested advice about imposing a rental fee for the property occupied by the clubs. The resulting City Attorney Opinion, issued December 29, 1977, relied on state common law and the city charter to conclude that exclusion of nonmembers from the clubs was improper. It stated also that the clubs must adopt adequate due process safeguards.

The Park Commission on March 16, 1978 adopted Resolution 11189, which announced procedures to ensure that all private organizations using park property would comply with the City Attorney's Opinion. The Resolution prohibited the clubs from rejecting an applicant for membership except for good cause and from expelling a member without a hearing.

Resolution 11189 limits the initiation fee to an amount reasonably related to the cost of processing applications and making the facilities available to the new member. Dues may be set no higher than necessary to meet current operating expenses, with other funds to be raised by special assessment. The Park Commission provided also for nonmember access to all park property under lease to private organizations.

On the day the Park Commission adopted Resolution 11189, appellants' attorney submitted a motion to amend the complaint to substitute plaintiffs and to add defendants. On April 20, 1978, the judge permitted the filing of the amended complaint, which marked the first appearance of the *Besig* plaintiffs in the suit.

For the next year, the Park Commission conducted negotiations with the clubs for long-term leases of the Aquatic Park property. On July 26, 1979, it approved leases for the Dolphin and South End clubs and adopted Resolution 11734, which specifically approved a preliminary format for the clubs' operation, including nonmember access to the facilities.

Under that resolution, both members and nonmembers have access to the clubs. The fee schedule, the times the clubs are open, and other procedures differ, depending on whether the user is a member or nonmember. The clubs are open to the nonmember

public from 9:00 a. m. to 5:00 p. m. five days a week, including weekends. They charge nonmembers $3.00 per day for access to the facilities, which entitles the nonmember to use all equipment and areas open to members except the clubs' boats. These require prior appointment, an additional charge, and proof that the user is able to use a boat safely.

In contrast to nonmember access terms, members of the clubs may use their building keys for access to the facilities at any time. After paying an initiation fee of $50.00, members pay yearly dues of $156 for Dolphin and $140 for South End.

■ The district court granted defendants' motion for summary judgment, finding the membership distinction not of constitutional dimension. It dismissed related state claims for lack of jurisdiction.[1]

The City's Recreation and Park Commission, through its lessee clubs, has established two categories of persons who may use the clubs' facilities, members and nonmembers, and has accorded different treatment to those in each classification.[2] We must decide whether this disparate treatment offends the equal protection clause of the Constitution.

*The Constitutional Claim*

The defendants do not dispute the existence of classifications consisting of members and nonmembers. They argue that the classifications are reasonable and that they were instituted to serve appropriate governmental interests. The defendants urge us to apply the rational basis test.

1. The related state claims had been asserted under the court's pendent jurisdiction. When the judge granted summary judgment for defendants on the federal issues, he properly dismissed the state claims. *Townsend v. Columbia Operations*, 667 F.2d 844, 850 (9th Cir. 1982).

2. A municipality clearly may charge fees for services. The defendants claim that the membership format is little more than a fee-collecting device. They assert that members easily could be called "unlimited users" instead of "members."

The plaintiffs argue for the application of a strict scrutiny analysis. They recognize that an equal protection claim is reviewed under strict scrutiny only when the classification defines a suspect class or when it implicates a fundamental right. *E.g., Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam).

Plaintiffs do not argue that nonmembers, who suffer none of the traditional suspect indicia, are a suspect class. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973). They attempt to implicate a fundamental right by arguing that the membership distinction restrains their first amendment right to association or, more precisely, their right of nonassociation.

■ We readily acknowledge that among the rights protected by the first amendment is that to freedom of association, *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), and its corollary, the freedom from coerced association with groups holding views with which the nonmembers disagree. In *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977), the Court explained:

A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind."

Appellants concede that they could not complain if all access fees were equal for members and nonmembers. They state that fees are different, but they fail to assert that, were they to tender an amount equal to the initiation fee and annual dues while disclaiming membership, the clubs would refuse to permit unlimited use of the facilities.

Without such a claim, we do not know even that terms and conditions differ depending on membership. In an effort to end this protracted litigation, we assume some difference in treatment.

■ Notwithstanding appellants' persistence in arguing under a nonassociation theory, they simply are not deprived of their right not to associate. They need not join any club. Nonmembers have been granted access to club facilities. That the access may be on less favorable terms than that granted to members may present other questions, but use of the club facilities does not depend on club membership or club association.

The decision in *Gavett v. Alexander*, 477 F.Supp. 1035 (D.D.C.1979), is not to the contrary. The statute in *Gavett* conditioned eligibility to purchase surplus government rifles on membership in the National Rifle Association. The court declared the statute unconstitutional because it infringed nonassociation rights.

The appellants would read *Gavett* to have invalidated the NRA membership requirement because it permitted members to receive a government benefit on terms different from those applicable to nonmembers. They argue that it applies to the disparate terms of access at issue here.

The benefit for which membership in the NRA was required was not eligibility for a *discount* on the price of the rifles. Under the statute, NRA members could buy rifles from the government at cost, while nonmembers were limited to the open market, at retail prices. *See id.* at 1039 & n.5. The statute did not provide a service under different terms, but absolutely barred nonmembers from participating in the government-provided benefit.

While *Gavett* may support the conclusion that nonmembers are due some access to club facilities, it fails to require more. Nor are appellants more successful with their reliance on *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

In *Abood* the Court held that a public employee cannot be compelled to pay union service fees in an amount that includes a portion devoted to political union activities

with which the employee disagrees. 431 U.S. at 234–35, 97 S.Ct. at 1799. We decline to place the basic right to employment in the same category of importance as a right to greater access to sports facilities. Even were we to do so, we would note that in *Abood* the failure to pay the union service fee absolutely barred employment, whereas club membership affects only the terms and conditions of access to the clubs' facilities.

Moreover, we are not unmindful of the apolitical nature of the activities involved here. The clubs currently advocate no special view or philosophy that appellants have identified as offensive. *See Sunset Amusement Co. v. Board of Police Commissioners*, 7 Cal.3d 64, 74–75, 496 P.2d 840, 845–46, 101 Cal.Rptr. 768, 773–74 (1972), *appeal dismissed*, 409 U.S. 1121, 93 S.Ct. 940, 35 L.Ed.2d 254 (1973). *See generally Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (public employee union's political activities); *Good v. Associated Students of University of Washington*, 86 Wash.2d 94, 542 P.2d 762 (1975) (student organization's political activity and financial contributions).

■ We conclude that the nonmember classification implicates no fundamental right sufficient to invoke a scrutiny more rigorous than one requiring a rational relationship between the classification and the articulated legislative purpose. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam).

■ We find the reasoning of the Park Commission and its stated purposes adequate to survive this equal protection challenge. The Park Commission, in its Resolution 11734 of July 26, 1979, and in the hearings surrounding the approval of the clubs' leases, identified several permissible justifications for the clubs and the access program, which we summarize briefly.

The Commission cited the value to the city of the clubs' continued existence. It

recognized that their organization of water activities contributed to a more intensive use of the park property. Commission members concluded that the Recreation and Park Department would be incapable of operating the facilities without the club format. Consequently, without a workable plan for continued club management, the facilities would close.

The clubs are venerable San Francisco institutions that have served the city from as early as 1888. They contribute to the community by their active participation in social and charitable causes, including financial and personnel support to a number of local groups.

The Dolphin and South End Clubs are self-supporting. They need no city funds to manage and maintain the facilities. Indeed, they have spent or committed several hundred thousand dollars to structural modification of their buildings. These expenditures have accommodated greater public use by increasing locker capacity, creating separate facilities for women, and endeavoring to correct fire, safety, health, and building code deficiencies.

The Park Commission agreed that most nonmember use would occur during daylight hours. It noted also that adequate security protection for persons and premises would be more difficult and more costly were the facilities open during the night. With these concerns identified, the Park Commission approved the clubs' closure at 5:00 p. m. Although members continue to have access thereafter, the Park Commission believed their financial commitment to evidence an interest in the clubs' continued safe operation.

The fees charged both members and nonmembers are limited to an amount reasonably related to expenses. Opening their doors to nonmembers required the clubs to hire additional personnel, arrange greater security protection, and incur higher operating expenses. The Park Commission approved a $3.00 daily admission charge, concluding that the small daily use charge probably would not recoup these additional expenses.[3]

The program adopted by the Commission for the management of the club facilities represents its balance of competing interests. The plan recognizes both the burden of keeping the facilities open to nonmembers as well as the obligation of the Commission and clubs to encourage maximum public use of the city's recreational facilities. The varied fee schedules and hours of access are reasonably related to the Commission's legitimate concern for the safe, efficient, and orderly use of the facilities and for providing continuing recreational services in the future.

The Park Commission's legislative conclusions and the exercise of its discretion were not irrational. The court below properly granted summary judgment in favor of defendants. We affirm on this substantive issue and turn to the question of attorneys fees.

## ATTORNEYS FEES

The appellants argue they are entitled to attorneys fees. They assert that, notwithstanding the grant of summary judgment to defendants, they should be considered prevailing parties because they caused the clubs to admit women members and the

---

**3.** Appellants cite *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), here as well. Without adequate support, *see generally Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981) (conclusory statements and assertions contained in legal memoranda fail to create material issues of fact), they claim that the nonmember use fees exceed the clubs' actual expenses created by nonmember use. But they failed to contradict the clubs' proof that nonmember fees have been insufficient to cover costs.

When nonmember fees fail to equal the costs of nonmember access to the facilities, the appellants cannot convincingly argue that the fees improperly support the promotion of political or ideological causes and doctrines with which they disagree. The Park Commission clearly may require nonmembers to pay a reasonable fee for the use of these facilities. *See Good v. Associated Students of Univ. of Wash.,* 86 Wash.2d 94, 542 P.2d 762 (1975).

Park Commission to institute some measure of nonmember access.

The district court refused to award fees, adopting a magistrate's report recommending that result. We review that decision for abuse of discretion. *E.g., Sethy v. Alameda County Water District,* 602 F.2d 894 (9th Cir. 1979) (per curiam), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980).

■ Only prevailing parties may recover attorneys fees, 42 U.S.C. § 1988, but a party may prevail without obtaining formal relief. *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). Because appellants did not receive a favorable judgment below, any entitlement to fees must rest on their role as catalyst for defendants' voluntary compliance with the relief sought in their complaint. *See, e.g., Bartholomew v. Watson,* 665 F.2d 910, 914 (9th Cir. 1982); *Sullivan v. Pennsylvania Dep't of Labor & Industry,* 663 F.2d 443, 447–51 (3d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982); *Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir. 1981).

To be considered catalysts for voluntary action by defendants, appellants must "establish some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized." *American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir. 1981) (emphasis in original). We must decide whether they have shown a sufficient causal connection.

The magistrate concluded that the *Besig* plaintiffs were not prevailing parties because they could claim no responsibility for any action taken in response to the suit filed by Marilyn Rodman. Appellants argue that the amendment of the complaint to substitute them for Rodman related back to the date the Rodman action was filed. Fed.R.Civ.P. 15(c). They claim entitlement for fees resulting from both the *Rodman* and *Besig* cases.

The relation back theory applies almost exclusively to avoid the statute of limitations when amendment to the complaint will not prejudice the defendant. *See* 3 Moore's Federal Practice § 15.15[3].[4] Notice is the critical inquiry.

■ An amendment equitably may relate back when the prior complaint has given adequate notice of the facts supporting a claim. Relation back imposes no prejudice when an amendment restates a claim with no new facts.

Notice from a previous complaint seldom is adequate when substituting plaintiffs, unless the change merely brings in the real party in interest or accomplishes some similar technical result. New, unrelated plaintiffs generally are unable to assert a cause of action sufficiently confined to the facts stated in the original pleadings to support an inference of adequate notice. Defendants usually are prejudiced by the different identity of plaintiffs, if by nothing else.

An amendment changing plaintiffs may relate back when the relief sought in the amended complaint is identical to that demanded originally. In such a case, despite lack of notice, the defendant is not prejudiced because his response to the action requires no revision.

■ Unless the substituted and substituting plaintiffs are so closely related that they in effect are but one, an amended complaint substituting plaintiffs relates back only when the relief sought is sufficiently similar to constitute an identity of interest. *See Summit Office Park, Inc. v. United States Steel Corp.,* 639 F.2d 1278 (5th Cir. 1981); *Staren v. American National Bank & Trust Co. of Chicago,* 529 F.2d 1257, 1263 (7th Cir. 1976); C. Wright & A. Miller, Federal Practice and Procedure

---

4. The few cases in which relation back may apply outside the context of statutes of limitations fail even remotely to suggest application of the doctrine to attorneys fees. *See generally* 3 Moore's Federal Practice § 15.15[6].

§§ 1499, 1501 (1971 & Supp.1981). The amendment to substitute the *Besig* plaintiffs for Rodman relates back only if appellants can show an identity of interest.

Marilyn Rodman sought to eliminate discriminatory club membership practices. She wished to become a member to take advantage of the clubs' secure facilities. When she learned that the suit was proceeding with the aim of forcing adoption of a "turnstile" operation, she withdrew immediately.

The amended complaint transformed the case from one seeking equal membership access to one seeking identical nonmember access. The *Besig* plaintiffs did not wish to become members. Their goals were hostile to those sought by Rodman.

The magistrate concluded that the *Besig* plaintiffs shared no identity of interest with Rodman. That conclusion is well supported by the evidence. Although Rodman's complaint contained a reference to nonmember access, the focus on eligibility for attorneys fees is whether plaintiffs prevail on the *central* issue of the litigation or acquire the primary relief they seek. *Iranian Students Association v. Edwards*, 604 F.2d 352, 353 (5th Cir. 1979). The central issue of this litigation changed when the *Besig* plaintiffs were substituted.[5]

 Because the focus of the litigation changed distinctly upon the amendment of

the complaint, appellants' reliance on relation back under Rule 15(c) cannot justify our reaching a result different from that below. Fed.R.Civ.P. 52(a); *see Williams v. Leatherbury*, 672 F.2d 549, 551 (5th Cir. 1982). Any entitlement to attorneys fees for these appellants must rest on their success, if any, after they became parties.

When the *Besig* plaintiffs moved for substitution in place of Rodman, the Park Commission already had ordered a plan requiring some nonmember access.[6] The appellants sued for identical nonmember access, the only issue fairly presented by their complaint, and lost.

They cannot claim to have caused the Park Commission to grant nonmember access as it exists currently, nor did they achieve identical access for nonmembers. They did not prevail, and the district court did not abuse its discretion by denying their request for fees.

## CONCLUSION

We affirm the judgment of the district court.

---

5. Appellants attach some significance to the framing of both complaints as class actions. They claim that Rodman's withdrawal and the substitution of new plaintiffs was nothing more than the replacement of class representatives in a single case.

   We have concluded that the new plaintiffs attempted to state a new cause of action. Both Rodman and the *Besig* plaintiffs fall within the purported class named in each complaint. But that class is the public at large, an uncertifiable class.

   Whether appellants argue relation back under Rule 15, class action pleading under Rule 23, or a combination of the two, they have failed to show an identity of interest.

6. The *Besig* plaintiffs entered this action after the Park Commission had adopted a nondis-

crimination resolution, the clubs had admitted several women members, including Marilyn Rodman, their by-laws were in compliance with the Park Commission's nondiscrimination mandate, the City Attorney had advised the Park Commission that nonmember access was necessary, and the Park Commission had adopted its Resolution 11189, requiring nonmember access.

After appellants' entry, the defendants negotiated new long-term leases for the clubs' premises. Following the Park Commission's approval on July 26, 1979, the Mayor approved them on October 12, 1979. On the same day it approved the leases, the Park Commission adopted a resolution governing the operation of the clubs, including the nonmember access plan now in effect.